**EDELL & ASSOCIATES, P.C., a New Jersey Professional Corporation; Marc Z. Edell, Plaintiffs–Appellants,**

v.

**LAW OFFICES OF PETER G. ANGELOS, a Maryland Professional Corporation, Defendant–Appellee.**

No. 00–2069.

United States Court of Appeals, Fourth Circuit.

Argued May 9, 2001.

Decided Aug. 24, 2001.

**ARGUED:** Martin Stanley Himeless, Jr., Zuckerman, Spaeder, Goldstein, Taylor & Better, L.L.P., Baltimore, MD, for Appellants. William J. Brennan, III, Smith, Stratton, Wise, Heher & Brennan, Princeton, NJ; Harley Thomas Howell, Howell & Gately, Baltimore, MD, for Appellee. **ON BRIEF:** Michel F. Baumeister, Dorothea M. Capone, Baumeister & Samuels, P.C., New York, NY, for Appellants. William F. Gately, Howell & Gately, Baltimore, MD, for Appellee.

Before WIDENER and WILLIAMS, Circuit Judges, and HAMILTON, Senior Circuit Judge.

Affirmed in part, vacated in part, and remanded for further proceedings by published opinion. Senior Judge HAMILTON wrote the opinion in which Judge WILLIAMS joined. Judge WIDENER wrote a separate concurring and dissenting opinion.

HAMILTON, Senior Circuit Judge:

This diversity jurisdiction action involves an attorneys' fee-sharing dispute between attorney Marc Edell (Edell) and his law firm, Edell & Associates, P.C., on the one hand, and the Law Offices of Peter G. Angelos (the Angelos Firm), on the other hand. The Attorney General of Maryland (the Maryland AG), Edell, his law firm, and the Angelos Firm jointly represented the State of Maryland (Maryland) in recent litigation against the tobacco industry to recover money dispersed in Medicaid payments for cigarette related diseases (the Maryland AG Action). The tobacco industry settled the Maryland AG Action for an estimated $4.4 billion.[1]

The Angelos Firm had minimal experience with litigation against the tobacco industry prior to its participation in the Maryland AG Action. For this reason, the Angelos Firm asked Edell and his law firm to join it in making a litigation proposal to the Maryland AG in an effort to represent Maryland in the Maryland AG Action.

Edell is widely recognized as a preeminent legal authority on litigation against the tobacco industry. Indeed, the litigation proposal the Angelos Firm ultimately submitted to the Maryland AG touted this fact and added: "As lead trial counsel for the plaintiff in *Cipollone v. Liggett Group*, Edell was the first to bring a successful suit to verdict against tobacco companies on behalf of a smoker, after five years of intensive litigation and a four-month trial in federal court in New Jersey." (J.A. 912). The litigation proposal assured the Maryland AG that if the Angelos Firm was retained, Edell would serve as co-lead counsel.

The Maryland AG accepted the Angelos Firm's litigation proposal, and under a fee-agreement between Maryland and the Angelos Firm, Maryland agreed to pay the Angelos Firm twenty-five percent of any amount recovered. Maryland did not enter into a separate fee agreement with Edell and his law firm. The amount of legal fees that Edell and his law firm would receive for their participation in the Maryland AG Action was always an issue to be determined solely between Edell and his law firm and the Angelos Firm.

The dispute in the present case is over the amount the Angelos Firm agreed to

---

1. In an affidavit submitted by Edell in the present action, he states that the tobacco industry settled with Maryland "for an amount estimated by the Defendant Angelos Firm to be more than $6.6 billion...." (J.A. 778). However, the latest estimate appears to be $4.4 billion. *Maryland v. Maryland Bd. of Contract Appeals*, 364 Md. 446, 773 A.2d 504, 507 (2001) (estimating Maryland's recovery from settlement in Maryland AG Action at $4.4 billion).

pay Edell and his law firm for their substantial participation in the Maryland AG Action. Edell and his law firm contend that in addition to the $798,218 in attorneys' fees (based upon varying hourly rates) they have already received from the Angelos Firm in connection with the Maryland AG Action, the Angelos Firm repeatedly promised that they would share fairly in any contingency fee it received at the conclusion of the case. According to Edell and his law firm, they never would have continued their substantial participation in the Maryland AG Action had the Angelos Firm not made these repeated promises and the Angelos Firm fully understands this. Because the Angelos Firm denies that it agreed to share any amount of the estimated $1.1 billion contingency fee that it may potentially receive in connection with the Maryland AG Action,[2] Edell and his law firm allege in the present action that the Angelos Firm is liable for breach of contract and breach of the covenant of good faith and fair dealing implied in such contract. The Angelos Firm flatly denies that it ever agreed that Edell and his law firm would share in any contingency fee that it would possibly receive at the conclusion of the Maryland AG Action and, therefore, refuses to pay them any further fees.

Edell and his law firm alternatively allege that if the Angelos Firm repeatedly promised it would share fairly with them any contingency fee recovered at the end of the case with the intent never to allow them to so share, the Angelos Firm is liable for intentional misrepresentation.

The Angelos Firm denies the allegation of intentional misrepresentation.

The district court granted summary judgment in favor of the Angelos Firm with respect to the three claims Edell and his law firm continue to press on appeal: (1) common law breach of contract; (2) common law breach of the covenant of good faith and fair dealing; and (3) common law intentional misrepresentation.[3] The district court also denied a motion filed by Edell and his law firm for leave to amend their complaint to allege a claim for negligent misrepresentation.

Edell and his law firm now appeal the grant of summary judgment in favor of the Angelos Firm with respect to all three listed claims. They also appeal the district court's denial of their motion for leave to amend their complaint to assert a negligent misrepresentation claim.

We affirm in part, vacate in part, and remand for further proceedings. Specifically, we: (1) vacate the district court's grant of summary judgment in favor of the Angelos Firm with respect to the breach of contract claim and remand for further proceedings with respect to that claim; (2) affirm the district court's grant of summary judgment with respect to the breach of the covenant of good faith and fair dealing claim; (3) vacate the district court's grant of summary judgment in favor of the Angelos Firm with respect to the intentional misrepresentation claim and remand for further proceedings with respect to that claim; and (4) vacate the district court's denial of the motion for leave to amend the complaint and remand

---

2. We use the word potentially because the Maryland AG refuses to pay the Angelos Firm the agreed 25% amount of the estimated $4.4 billion settlement figure on the ground, *inter alia,* that the fee is excessive. The Angelos Firm and Maryland are in litigation over the issue. *Maryland,* 773 A.2d at 507.

3. Other remaining claims were also dismissed, but are either not at issue in the present appeal or are duplicitous of the three claims we just listed. For example, Edell and his law firm asserted a claim seeking a declaratory judgment that is in all material respects duplicitous of his breach of contract claim.

with instructions that the district court grant the motion.

I

Because this case comes to us from the grant of a motion for summary judgment in favor of the Angelos Firm, we present the facts in the light most favorable to Edell and his law firm, drawing all reasonable inferences from the evidence in their favor. *Reeves v. Sanderson Plumbing Products,* 530 U.S. 133, 149–150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

In 1995, the Maryland AG solicited proposals from lawyers and law firms to represent Maryland against the tobacco industry in an effort to recover money that Maryland dispersed in Medicaid payments for cigarette related diseases. The Angelos Firm desired to submit such a proposal, but had minimal experience in prosecuting claims against the tobacco industry. Thus, in December 1995, the Angelos Firm approached Edell, a tobacco litigation expert, about the possibility of Edell and his law firm participating on the litigation team the Angelos Firm intended to propose to the Maryland AG. The Angelos Firm was also extremely anxious to obtain access to the data base of tobacco documents and testimony that Edell had amassed over more than a decade of pursuing litigation against the tobacco industry.

Relying on the repeated promises made by the Angelos Firm that Edell and his law firm would share with them any contingency fee recovered at the conclusion of the Maryland AG Action, Edell, on behalf of himself and his law firm, accepted its invitation to join the litigation team, although the terms of the compensation to be paid them were still undetermined. On December 29, 1995, Peter Angelos submitted his firm's litigation proposal to the Maryland AG, prominently naming Edell

as co-lead counsel. The litigation proposal described Edell's credentials as a tobacco litigation expert in detail. That the Angelos Firm believed Edell was a heavy hitter in the field of litigation against the tobacco industry, and used Edell's reputation as such to lure the Maryland AG to accept its litigation proposal, is evidenced by the fact that the litigation proposal stated that the Angelos Firm's involvement of Edell "underscore[d][its] commitment to field the strongest possible team." (J.A. 899).

After submission of the litigation proposal, Peter Angelos, through H. Russell Smouse (Smouse), a senior attorney employed by the Angelos Firm and Peter Angelos' " 'right hand' and No.2 man," began negotiating with Edell regarding Edell and his law firm's compensation arrangement. (J.A. 747). On January 17, 1996, Edell sent a letter to Smouse proposing that he and his law firm receive a flat fee each year, and 20% of any contingency fee recovered in the final disposition of the Maryland AG Action.

Smouse responded by telephone a few days later. Smouse did not object to the basic structure of Edell's proposal; rather he advised Edell that he felt that the 20% amount suggested by Edell for the contingency fee component was " 'too steep.' " (J.A. 751). Edell offered a revised proposal by letter dated January 25, 1996, proposing a larger flat fee, 10% of any contingency fee recovered for the first $100 million obtained, and 5% of any fee recovered above $100 million.

Despite these efforts at negotiation, by March 1996, the compensation issue between Edell, his law firm, and the Angelos Firm had not been resolved. As a result, Edell and his law firm and the Angelos Firm agreed, at the suggestion of the Angelos Firm, to an arrangement by which Edell and his law firm would have only a

limited role in the Maryland AG Action. Therefore, on March 4, 1996, Edell, on behalf of himself and his law firm, and the Angelos Firm entered into a signed compensation agreement (the March 1996 Compensation Agreement). Upon the condition that the Maryland AG accepted the Angelos Firm's litigation proposal, the March 1996 Compensation Agreement provided that Edell would devote fifteen hours per month to the Maryland AG Action and provide the Angelos Firm with copies of all documents relevant to the tobacco litigation to which Edell had access. In exchange, the Angelos Firm would collectively pay Edell and his law firm $10,000 per month, with payments totaling a guaranteed minimum of $500,000. In addition, the Angelos Firm would advance all expenses incurred during the litigation, subject to reimbursement only in the event of a recovery.

On March 19, 1996, the Maryland AG accepted the Angelos Firm's litigation proposal without knowledge of the reduced role that Edell and his law firm were now slated to perform. Indeed, in a press release announcing his hiring of outside counsel to represent Maryland in the Maryland AG Action, the Maryland AG identified Edell as one of the "key players on the Maryland tobacco litigation team" and as "one of the country's preeminent authorities on tobacco litigation and the first lawyer to bring a successful suit to verdict against the tobacco companies on behalf of a smoker (*Cipollone v. Liggett*)." (J.A. 753). Following the press release, Peter Angelos and Maryland executed a representation contract providing the Angelos Firm with a 25% contingency fee. Notably, the contract prohibited the Angelos Firm from making any changes in the composition of the litigation team slated to handle the case, which included Edell, without the prior written consent of the Maryland AG or his designee.

In April 1996, the Attorney General for the State of New Jersey (the New Jersey AG) similarly requested proposals from lawyers nationwide to serve as New Jersey's special counsel in a planned Medicaid reimbursement action against major players in the tobacco industry. The Angelos Firm sought to submit a litigation proposal in response and once again asked Edell to participate. At the same time, two different groups of New Jersey attorneys inquired whether Edell would be interested in joining in their respective litigation proposals to New Jersey.

Edell informed Smouse of these inquiries. Smouse responded with "unequivocal assurances of a rewarding 'partnership'" between Edell and his law firm and the Angelos Firm in current and future tobacco litigation. (J.A. 754) Indeed, Smouse urged Edell to "stick with" the Angelos Firm and to reject any offer to join other bids for appointment as special counsel in New Jersey's planned litigation against major players in the tobacco industry. *Id.*

Based upon Smouse's representations and assurances on behalf of the Angelos Firm, Edell and his law firm joined with the Angelos Firm in submitting a litigation proposal to the Attorney General of New Jersey and rejected the invitations by the two groups of New Jersey attorneys to join in their litigation proposals. The New Jersey AG rejected the proposal submitted by Edell, his law firm, and the Angelos Firm, because under their proposal, the Angelos Firm was only obligated to advance 50% of the litigation expenses. The New Jersey AG wanted 100% of the litigation expenses advanced. Ultimately, the New Jersey AG accepted the proposal of one of the groups of New Jersey attorneys that Edell and his law firm had informed they would not join with in making a litigation proposal.

Even after the New Jersey AG had selected the litigation proposal it did, a representative of the New Jersey AG's office invited Edell and his law firm to join the litigation team the New Jersey AG had selected. Upon learning this fact, Smouse asked Edell to reject the invitation and work exclusively with the Angelos Firm in the prosecution of the Maryland AG Action. "In light of [ ] Smouse's repeated representations that [they] were 'partners' in the tobacco litigation and his assurances of a 'one for all team approach,'" Edell politely rejected the invitation extended by the representative of the New Jersey AG's Office. (J.A. 756).

On May 1, 1996, the Angelos Firm and the Maryland AG jointly filed a complaint on behalf of Maryland in Maryland state court against major players in the tobacco industry, including Philip Morris Companies, Inc. and R.J. Reynolds Tobacco Company. As requested by the Angelos Firm, Edell began devoting more than fifteen hours per month to the Maryland AG Action and submitted a new compensation proposal, dated June 4, 1996, to the Angelos Firm. Edell proposed to devote 80% of his time to the Maryland AG Action in exchange for $25,000 per month for a minimum of fifty months, plus 8% of the first $250 million in fees obtained and 5% of any fees obtained in excess of $250 million.

In response to this new compensation proposal, Edell had numerous conversations over the next few months with Smouse in an effort to finalize a new compensation scheme. During those negotiations, Edell and his law firm, at the specific request of the Angelos Firm, continued in good faith to commit more and more time and resources to the Maryland AG Action.

Among the categories of work performed by Edell and his law firm in the Maryland AG Action were: (1) periodic preparation of litigation strategy memos for Smouse outlining the discovery required, the organizational efforts required to be undertaken, third-party documents required to be obtained, the types of experts required to be retained (as well as identifying specific individuals who could be retained in many of these categories) and the efforts required to be undertaken in anticipation of trial; (2) contact and retention of expert witnesses; (3) review and revision of pleadings and briefs to be filed with the court as forwarded by the Angelos Firm to Edell and his law firm for review and comment; (4) consultation with attorneys from the Angelos Firm on hundreds of factual and procedural issues due to those attorneys' inexperience and/or uncertainty as to the manner in which the issue should be handled; (5) legal research; (6) preparation of discovery requests; (7) instructing inexperienced attorneys from the Angelos Firm on deposition preparation and document organization; (8) development and implementation of a computerized data base of deposition and trial testimony of industry witnesses; (9) development and implementation of a computerized data base of thousands of industry documents, integrating documents produced during the discovery process into the data base shared with the Angelos Firm; (10) preparation for depositions of critical state and industry witnesses; (11) review of daily correspondence and other filings; (12) meetings with attorneys from the Angelos Firm; (13) attendance at depositions with attorneys from the Angelos Firm; (14) receipt and response to hundreds of telephone calls from attorneys from the Angelos Firm; (15) receipt and response to innumerable faxes and e-mails from attorneys from the Angelos Firm; (16) telephone conferences with counsel for the tobacco companies; (17) preparation and revision of experts' reports; (18) summarizing deposition transcripts; and (19)

identifying for the Angelos Firm industry witnesses whose testimony should be taken. Additionally, Edell appeared at, and actively participated in, case management conferences held before the state trial judge. Also, Edell argued many of the more significant motions and participated in virtually all of the significant strategy decisions during the litigation.

In light of Edell's rapidly increasing litigation responsibilities, he wrote to Smouse on February 14, 1997, proposing that he be paid an hourly rate of $325 for every hour he spent on the Maryland AG Action beyond the fifteen-hours per month as stated in the March 1996 Compensation Agreement. He also suggested an hourly rate of $75 for his paralegal. The final sentence of the letter stated: "I hope you find these terms to be reasonable and acceptable. I look forward to resolving *the global issue* with you within the next few weeks." (J.A. 170) (emphasis added). The global issue is the percentage Edell and his law firm would share in any contingency fee that the Angelos Firm may receive at the conclusion of the litigation. From henceforth, we will refer to this issue as "the Contingency–Fee Issue."

Edell and his law firm continued to dedicate increasing amounts of time and effort to the Maryland AG Action, and the Angelos Firm compensated Edell in accordance with Edell's letter dated February 14, 1997 (the February 1997 Compensation Agreement). At the same time, Edell and Smouse continued their dialogue with respect to the Contingency–Fee Issue.

During a telephone conversation on June 4, 1997, Smouse told Edell that Peter Angelos has always assured him and, therefore, indirectly Edell, that if and when there is a "payday," Edell and his law firm "will be generously compensated for [their] participation in this case." (J.A. 760). In response, Edell told Smouse that because he trusted their relationship and Smouse's judgment on the matter, he and his law firm would continue working on the Maryland AG Action without a formal agreement.

On June 17, 1997, Edell and Smouse discussed the Contingency–Fee Issue face to face, but did not resolve it. Nonetheless, Smouse agreed to draft an agreement addressing the issue and memorializing the revised terms of Edell and his law firm's compensation to which the parties had already agreed. By July 29, 1997, Smouse had not drafted such an agreement. Thus, Edell wrote Smouse a reminder letter. The letter also reported the hours Edell and his paralegal had spent on the Maryland AG Action for the months March through June 1997 and the related litigation costs incurred. The letter cautioned Smouse that the stated amount owed "[did not] reflect the contingency fee component which we have also discussed." (J.A. 965).

By letter dated August 4, 1997, Smouse stated that he was not aware that he had agreed to draft a compensation agreement regarding Edell and his law firm. Smouse added, however, that he would be "very happy to discuss all of that with [Edell]" in a face to face meeting. (J.A. 967). Notably, Smouse did not, at this time, object, question, or deny the statement in Edell's letter that the figure representing the fees and costs for March through June 1997, did not reflect the Contingency–Fee Issue, which the parties had also discussed.

Edell and his law firm obliged the continued pressures of the Angelos Firm to contribute more hours to the Maryland AG Action. Indeed, trial in the Maryland AG Action was set for April 1999. As a consequence of the increased amount of resources Edell and his law firm were devoting to the Maryland AG Action, they curtailed their work on other firm matters, and were forced to reject new business.

The Angelos Firm paid Edell and his law firm the hourly rates and expenses due in accordance with the March 1996 and February 1997 Compensation Agreements. Notably, every monthly invoice sent to the Angelos Firm by Edell and his law firm, including ones sent by fax on April 20, 1998 and July 10, 1998, contained a reminder that the invoice did not reflect the contingency fee component of their compensation.

In response to the April 20, 1998 invoice, Smouse telephoned Edell on May 12, 1998 to discuss the reference to the contingency fee component of their compensation. This was the first time in over a year of communications concerning the Contingency–Fee Issue that the Angelos Firm questioned Edell and his firm's right to share in any contingency fee the Angelos Firm recovered at the conclusion of the case. On May 15, 1998, Edell wrote Smouse as follows:

> I am writing as a follow up to our telephone conversation of May 12, 1998, concerning my [April 1998 invoice].
>
> If I created the misimpression that we had reached an agreement on the specific percentage of my participation in any legal fees that may be received in the Maryland [AG Action], that was not my intent. While we did agree that in consideration of my expanded roll with your firm in the prosecution of [this case], I would receive a contingent fee in addition to hourly compensation, we were unable to reach an understanding on the percentage amount of such contingent component. That being the case, I accepted Peter's assurance that when and if a fee was generated he would "do the right thing" respecting my participation in those monies. I continue to take Peter at his word.

(J.A. 974).

During the next two months, neither Smouse nor any other authorized representative of the Angelos Firm objected to, or denied the accuracy of the statements contained in Edell's May 15, 1998 letter. Instead, the Angelos Firm imposed greater and greater responsibilities upon Edell with respect to the Maryland AG Action.

By July 10, 1998, settlement negotiations between the parties to the Maryland AG Action became serious. At this same time, Smouse reassured Edell and his law firm by letter dated July 10, 1998, with enclosures, that they will be paid at the agreed rate for the time they had expended and will expend on the Maryland AG Action. In the same letter, although Smouse denied that he ever agreed that Edell and his law firm would share in any contingency fee recovered at the conclusion of the case, Smouse admitted that he had stated to Edell, on more than one occasion, that he firmly believed "Peter would deal with [him] fairly ..." at the conclusion of the case. (J.A. 980). Smouse also assured Edell that he still believed this to be the case, and that he sincerely hoped Edell would continue in the case by trusting and having faith that Peter Angelos would deal with Edell and his law firm fairly at the conclusion of the case.

Shortly thereafter, the settlement negotiations between the Maryland AG and the tobacco industry came to an apparent standstill, and the prospect of an April 1999 trial loomed as a potential reality with a significant amount of unconducted discovery. Faced with this prospect, the Angelos Firm requested Edell to dedicate four days a week in Baltimore to furthering the litigation, and to submit yet another proposal concerning the Contingency–Fee Issue. In this regard, Edell wrote Smouse on July 26, 1998, outlining the terms under which he and his law firm would be willing to expand their role even

further, the consequence of which would require that Edell, in essence, walk away from his New Jersey law practice and move to Maryland for the remainder of the litigation. In the letter, in addition to receiving flat fees, Edell requested 10% of any contingency fee that the Angelos Firm might receive at the conclusion of the case. Edell hand-delivered this letter to Smouse.

Upon Smouse's review of the letter, Smouse once again, acting on behalf of the Angelos Firm, impliedly reaffirmed that Edell and his law firm would receive compensation in addition to the hourly billings agreed to in the March 1996 and February 1997 Compensation Agreements. Specifically, Smouse reiterated his statement that " 'when the litigation is resolved Peter will do the right thing.' " (J.A. 770). During the same conversation, Smouse also inquired as to whether the 10% contingency fee figure suggested by Edell in his July 26, 1998 letter was negotiable.

On August 3, 1998, Edell submitted an invoice to the Angelos Firm for July 1998. The invoice specifically stated that the fees requested in the invoice did not include the " 'Peter will do the right thing at the end of litigation,' " component of Edell and his firm's fee. (J.A. 985). The Angelos Firm paid the July 1998 invoice without comment. Additionally, Smouse told Edell that Peter Angelos would meet with him on August 10, 1998, to discuss the Contingency–Fee Issue. When Edell arrived for the scheduled meeting, Smouse informed him that Peter Angelos would not be available to meet with him until August 13, 1998.

On August 12, 1998, Edell wrote and sent Smouse the following clarifying letter:

> From our correspondence on this issue, it is clear that we all agree that in the event of a recovery in this action, I will receive from the law offices of Peter G. Angelos, in addition to my hourly com-

pensation, a lump sum payment as further remuneration. In my correspondence, I have referred to this additional remuneration as "the contingent component of my fee" or "Peter's assurance that when and if a fee was generated he would 'do the right thing' respecting my participation in those monies." You have chosen to refer to it as "Peter's commitment to deal with me fairly at the conclusion of the litigation." The label we choose to apply to this additional remuneration [is] irrelevant. We can call it a "bonus," a "kicker," a "premium," a "contingent fee component," or "Peter's commitment to deal with me fairly at the conclusion of the litigation." They are all the same and reflect nothing more than the express agreement [that] we have all [been] working under for some time now regarding my receipt of additional remuneration at the successful conclusion of the matter.

> The events of the past few weeks (*e.g.*, cancellation of numerous meetings scheduled with Peter to discuss the proposal I submitted to you at his request, your request for me to withdraw my proposal, and letters sent by you concerning fee issues, etc.), in conjunction with the current settlement discussions between the tobacco industry and the various state Attorney Generals, might be viewed with suspicion by someone unfamiliar with our personal and professional relationship. That being the case, I would greatly appreciate reassurance from you as to Peter's commitments to me, as a reaffirmation of the faith and trust I have placed in you and Peter.

(J.A. 312).

On August 13, 1998, Smouse, acting on behalf of the Angelos Firm, sent a letter to Edell disavowing any agreement between them under which Edell and his firm would receive any additional compensation

beyond the hourly billing rates set forth in the March 1996 and February 1997 Compensation Agreements. Smouse further demanded that Edell confirm, in writing, that no contingent fee agreement existed between the parties. Edell immediately responded by letter as follows:

> I am sad to say that I am in receipt of your letter of even date.... I will not waste my time reiterating the FACTS. They are well documented and will substantiate that which is reflected in my May 15, 1998 and July 26, 1998 letters. I will only say that, unfortunately, the cynics were once again proven correct. Shame on me for being so trusting.

(J.A. 312).

On August 15, 1998, Smouse related to Edell that Peter Angelos would meet with him on August 17, 1998, on the condition that Edell withdraw his July 26, 1998 letter detailing his last fee-sharing proposal. Edell complied with the condition the very next day by sending the following fax to Smouse: "Pursuant to your request at our meeting on August 15, 1998, and in an effort to facilitate our discussions scheduled for Monday, August 17, 1998, I hereby withdraw my letter dated July 26, 1998." (J.A. 318).

Late in the morning on August 17, 1998, Smouse informed Edell that his August 16, 1998 fax withdrawing his July 26, 1998 letter was insufficient, and that Peter Angelos would not meet with Edell until he confirmed, in writing, that Edell and his law firm were not entitled to a contingency fee for their participation in, and overall contribution to, the Maryland AG Action. During this telephone conversation, Smouse stated that it was the Angelos Firm's position that Edell and his law firm were not entitled to receive any compensation beyond hourly fees.

Not surprisingly, Edell refused to write such a confirmation letter. Nonetheless, Edell and his law firm continued to represent Maryland in the Maryland AG Action based upon client loyalty and upon a mutual understanding that the Contingency-Fee Issue would be resolved at the conclusion of the Maryland AG Action.

As discovery and trial preparations continued, on November 18, 1998, the defendants in the Maryland AG Action settled the case for an estimated $4.4 billion.[4] Pursuant to its fee agreement with Maryland, the Angelos Firm stands to recover an estimated $1.1 billion in attorneys' fees. In total, Edell and his law firm received $798,218 in hourly attorneys' fees for their participation in the Maryland AG Action.

On February 9, 1999, Edell and his law firm filed this diversity action in the United States District Court for the District of New Jersey against the Angelos Firm. The case was ultimately transferred to the United States District Court for the District of Maryland, after which the district court: (1) denied a motion by the Plaintiffs to amend their complaint to allege a negligent misrepresentation claim; and (2) entered final judgment fully in favor of the Angelos Firm based upon its motion for summary judgment; this timely appeal followed.

## II

We review the grant of a motion for summary judgment *de novo*. *Higgins v. E.I. DuPont de Nemours and Co.*, 863 F.2d 1162, 1167 (4th Cir.1988). In reviewing the evidence in the record, we should draw all reasonable inferences in favor of the non-moving party, here, Edell and his law firm, and we may not make credibility determinations or weigh the evidence. *Reeves*, 530 U.S. at 149–150, 120 S.Ct.

4. *See* Footnote 1 of this opinion, *supra,* at 427.

2097. Although we should review the record as a whole, we must disregard all evidence favorable to the moving party, here, the Angelos Firm, that a jury would not be required to believe. *Id.* at 151. "That is, [we] should give credence to the evidence favoring the non-movant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that the evidence comes from disinterested witnesses." *Id.* (internal quotation marks omitted).

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

### III

Edell and his law firm first contend the district court's grant of the Angelos Firm's motion for summary judgment with respect to their breach of contract claim should be vacated and remanded for further proceedings. We agree.

#### A. The Arguments of Edell and His Law Firm.

Succinctly stated, Edell and his law firm seek to enforce a contract that they allege existed between them and the Angelos Firm, whereby the Angelos Firm agreed that Edell and his law firm would share fairly (in addition to the hourly-rate fees agreed upon) in any contingency fee that it might receive at the conclusion of the Maryland AG Action. In consideration for such agreement, Edell and his law firm continued to substantially participate in the Maryland AG Action at the expense of working on other fee-generating cases. To meet their burden of proffering suffi-

cient evidence from which a reasonable jury could find that the Angelos Firm agreed to this fee-sharing arrangement, Edell and his law firm rely upon: (1) the numerous oral and written representations made by Smouse, Peter Angelos' right-hand man, to this general effect; and (2) the Angelos Firm's long silence in the face of repeated statements in the invoices that Edell and his law firm sent to the Angelos Firm reminding it that the invoice did not reflect the contingency fee component of their compensation arrangement. Edell and his law firm argue that, at a minimum, this evidence works to equitably estop the Angelos Firm from denying the existence of the contingency fee-sharing agreement they now seek to enforce.

With respect to determining the actual percentage that Edell and his law firm would receive of any contingency fee the Angelos Firm recovered (a term Edell and his law firm admit was never expressly agreed upon), Edell and his law firm rely upon the holding by Maryland's highest court that Rule 1.5(e) of the Maryland Lawyers' Rules of Professional Conduct (MLRPC) "does constitute a supervening statement of public policy to which fee-sharing agreements by lawyers are subject, and that the enforcement of Rule 1.5(e) is not limited to disciplinary proceedings." *Post v. Bregman,* 349 Md. 142, 707 A.2d 806, 818 (1998). MLRPC 1.5(e) provides:

*A division of fee between lawyers who are not in the same firm may be made only if:*

*(1) the division is in proportion to the services performed by each lawyer* or, by written agreement with the client, each lawyer assumes joint responsibility for the representation;

*(2) the client is advised of and does not object to the participation of all the lawyers involved; and*

(3) the total fee is reasonable.

(emphasis added). Edell and his law firm argue that because the Angelos Firm agreed that they would share in any contingency fee the Angelos Firm received at the conclusion of the Maryland AG Action, in exchange for their continued substantial participation in the case, MLRPC 1.5(e) implies, by operation of law, that the sharing must be in proportion to the services they performed. In other words, once the Angelos Firm agreed to any sharing of the potential contingency fee, Maryland law deems them to have agreed to pay Edell and his law firm *the only percentage* of that contingency fee to which it could ethically agree. Edell and his law firm fervently maintain that such a result is consistent with Maryland law's disfavor with the destruction of contracts because of uncertainty and its command that contracts should be construed, if possible, "to carry into effect the reasonable intention of the parties if that can be ascertained." *Born v. Hammond,* 218 Md. 184, 146 A.2d 44, 47 (1958). ("The agreement will be sustained if the meaning of the parties can be ascertained, either from the express terms of the instrument or by fair implication. The law does not favor, but leans against the destruction of contracts because of uncertainty; therefore, the courts will, if possible, so construe the contract as to carry into effect the reasonable intention of the parties if that can be ascertained.").

### B. The Responsive Arguments of the Angelos Firm.

The Angelos Firm offers numerous arguments in response to Edell and his law firm's arguments in support of their breach of contract claim. First and foremost, the Angelos Firm vigorously argues that, under the circumstances, no reasonable jury could find that the Angelos Firm agreed that Edell and his law firm would share (in addition to the hourly-rate fees agreed upon) in any contingency fee that it had the potential to receive at the conclusion of the Maryland AG Action. The first circumstance it highlights is that Edell did not copy Peter Angelos, the sole shareholder in the Angelos Firm, on any of his letters and faxes to Smouse prior to Edell's letter of July 26, 1998.[5] Furthermore, the Angelos Firm argues that the implausibility of the alleged fee-sharing agreement sought to be enforced by Edell and his law firm is underscored by the gross disparity in financial risks undertaken by the parties; Edell bargained for and received a guaranteed regular stream of income (*i.e.,* the hourly fees), while the Angelos Firm fronted 100% of the litigation expenses and took the case on a completely contingent basis.

Second, the Angelos Firm emphasizes that its fee agreement with Maryland prevented it from assigning, transferring, conveying, or otherwise disposing of any rights created under that agreement to any person, firm or partnership, without the prior written consent of the Maryland AG. According to the Angelos Firm, in the absence of such written consent, an oral agreement to assign Edell and his law firm a percentage share of the fees recoverable under its fee agreement with Maryland would have been *ultra vires* and unenforceable.

Third, the Angelos Firm argues that Edell and his law firm's breach of contract claim must fail because a material term of the contract sought to be enforced is missing—namely, the percentage to be paid to Edell and his law firm of any contingency

---

**5.** Notably, the Angelos Firm does not argue that Smouse lacked agency authority to bind the Angelos Firm contractually in this matter.

fee that the Angelos Firm had the potential to receive at the conclusion of the Maryland AG Action. In support of this argument, the Angelos Firm relies upon the general rule in Maryland that an enforceable contract does not exist unless the parties have agreed to all material terms of the contract sought to be enforced. *Beck v. Bernstein*, 198 Md. 244, 81 A.2d 608, 609 (1951) ("A contract, to be final, must include all the terms which the parties intend to introduce and material terms cannot be left for future settlement. Either party is at liberty to put an end to the negotiations until actual completion of the bargain."); *Peoples Drug Stores v. Fenton Realty Corporation*, 191 Md. 489, 62 A.2d 273, 276 (1948) (same). One of the chief rationales for this general rule is that courts should not be in the business of making contracts for parties. *Horsey v. Horsey*, 329 Md. 392, 620 A.2d 305, 319 (1993). The other chief rationale is that "the terms of a contract must be sufficiently definite for enforcement. . . ." *Id.*

The fourth argument that the Angelos Firm makes in response to Edell and his law firm's breach of contract claim is that their equitable estoppel argument fails on the basis of waiver and on the merits. Specifically, the Angelos Firm argues Edell and his law firm waived their right on appeal to argue the applicability of the doctrine of equitable estoppel by not arguing it below. Alternatively, the Angelos Firm argues that Edell and his law firm's equitable estoppel argument fails on the merits for lack of evidence that the Angelos Firm made a clear and definite promise that they would share in any contingency fee that the Angelos Firm received at the conclusion of the Maryland AG Action.

Fifth and finally, the Angelos Firm urges us to reject Edell and his law firm's argument regarding MLRPC 1.5(e) on the basis that they waived their right on appeal to argue its application by not arguing it below and on the basis that the argument erroneously presupposes that the Angelos Firm agreed that Edell and his law firm would share in any contingency fee that the Angelos Firm received.

## C. Our Analysis.

We conclude that Edell and his law firm have met their summary judgment burden of proffering sufficient evidence for a reasonable jury to find that the Angelos Firm agreed to pay them (in addition to the hourly-rate fees agreed upon) a fair portion of any contingency fee it might receive at the conclusion of the Maryland AG Action. Consideration for this contractual arrangement is found in Edell and his law firm's promised continued substantial participation in the Maryland AG Action at the expense of foregoing other fee-generating cases. In part, they have met this burden by offering evidence that following the execution of the March 1996 and February 1997 Compensation Agreements, the Angelos Firm, through Smouse: (1) informed Edell, during a telephone conversation on June 4, 1997, that if and when there is a "payday," Edell and his law firm "will be generously compensated for [their] participation in this case" (J.A. 760); (2) Smouse's admission in a letter to Edell, dated July 10, 1998, that he had stated on more than one occasion, that he firmly believed "Peter would deal with [him] fairly . . ." at the conclusion of the case (J.A. 980); (3) Smouse's assurance in the same letter that he still believed this to be the case, and that he sincerely hoped Edell would continue in the case by trusting and having faith that Peter Angelos would deal with Edell and his law firm fairly at the conclusion of the case; and (4) on July 26, 1998, Smouse impliedly reaffirmed that Edell and his law firm would receive compensation in addition to the hourly billings agreed to in the March 1996 and February

1997 Compensation Agreements and queried Edell as to whether the 10% contingency fee figure suggested by Edell in his July 26, 1998 letter was negotiable. *Porter v. General Boiler Casing Co.*, 284 Md. 402, 396 A.2d 1090, 1095 (1979) (reiterating that under Maryland law acceptance of a contract can be accomplished by acts as well as words with no formal acceptance being required).

The fact that Edell did not copy Peter Angelos, the sole shareholder in the Angelos Firm, on any of his letters and faxes to Smouse prior to Edell's letter of July 26, 1998 is merely fodder for the Angelos Firm's closing argument before the jury. Edell knew that Smouse was a senior attorney at the Angelos Firm, Peter Angelos' right-hand man, and one of the lead counsels in the Maryland AG Action. Furthermore, Smouse represented to Edell that he was negotiating with Edell on behalf of Peter Angelos. Under these circumstances, a reasonable jury could find that Edell's failure to copy Peter Angelos on most of his letters and faxes to Smouse was reasonable behavior. Also fodder for closing argument by the Angelos Firm is the fact that it was obligated to front all the expenses of the Maryland AG Action while Edell and his law firm had no such obligation. Indeed, this fact is of almost no consequence because it does not negate the existence of a fee-sharing agreement.

■ We also find no merit in the Angelos Firm's *ultra vires* argument. We agree with Edell and his law firm that the Angelos Firm's *ultra vires* argument misapprehends the basic nature of an assignment when it argues that an agreement to share the potential contingency fee would have violated the prohibition of assignment in its contract with the Maryland AG. An assignment is a transfer of one's rights. *Petals Factory Outlet v. EWH & Assocs.*, 90 Md.App. 312, 600 A.2d 1170, 1174 (1992). Edell nor his law firm has ever claimed that the Angelos Firm assigned them any right under the Angelos Firm's fee agreement with the Maryland AG. Rather, Edell and his law firm's position has always been that the Angelos Firm had a contractual duty to pay them a fair portion of any contingency fee it may receive at the conclusion of the Maryland AG Action aside from any provisions in the Angelos Firm's fee agreement with the Maryland AG.

Turning to the balance of Edell and his law firm's evidentiary burden at summary judgment, we hold they have met the balance of their burden by offering evidence that: (1) the Angelos Firm knew the terms on which Edell and his law firm's services were being offered (*i.e.*, hourly fees plus sharing fairly in any contingency fee the Angelos Firm received at the conclusion of the Maryland AG Action); (2) the Angelos Firm received the benefit of those services in silence until it became quite probable that the Maryland AG Action would result in a settlement amount significantly greater than initially anticipated; and (3) the Angelos Firm did so when it had an opportunity to express its rejection of the offer. *Porter*, 396 A.2d at 1095 (holding that silence operates as an acceptance to an offer where services are rendered under such circumstances that party benefitted thereby knows terms on which they are being offered and, he receives the benefit of those services in silence, having had a reasonable opportunity to express his rejection of offer) (holding under Maryland law that acceptance of a contract can be accomplished by acts as well as words; no formal acceptance is required); *University Nat'l Bank v. Wolfe*, 279 Md. 512, 369 A.2d 570, 576 (1977) (parties can "substitute a new oral contract by conduct and intimation, as well as by express words"); *Cole v. Wilbanks*, 226 Md. 34, 171 A.2d 711, 712

(1961) ("Assent to an offer to vary, modify or change a contract may be implied and found from circumstances and the conduct of the parties showing acquiescence or agreement.").

Allowing a party's silence to operate as an acceptance to an offer where services are rendered under such circumstances that the party who benefitted thereby knows the terms on which they are being offered and receives the benefit of those services in silence, having had a reasonable opportunity to express his rejection of the offer, is a consequence of the doctrine of equitable estoppel. *Ganley v. G & W Ltd. Partnership,* 44 Md.App. 568, 409 A.2d 761, 764 (1980). Allowing the trier of fact to consider the import of the Angelos Firm's silence in the face of Edell and his law firm's repeated statements that they were continuing to devote significant portions of their time to the Maryland AG Action based in part on the mutual agreement that they would share fairly (in addition to the hourly-rate fees agreed upon) in any contingency fee the Angelos Firm received at the conclusion of the Maryland AG Action is in complete accord with Maryland law holding that "the determination of whether the conduct of the parties subsequent to the execution of a written contract constitutes a modification is ordinarily a question left to the factfinder." *Berringer v. Steele,* 133 Md.App. 442, 758 A.2d 574, 608 (2000).

■■ Moreover, we reject the Angelos Firm's arguments in opposition to Edell and his law firm's invocation of the doctrine of equitable estoppel. First, the record amply refutes the Angelos Firm's assertion that Edell and his law firm failed to argue equitable estoppel. For example, in "PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THE DEFENDANT LAW OFFICES OF PETER G. ANGELOS' MOTION FOR SUM-MARY JUDGMENT," (J.A. 563), Edell and his law firm made the following argument:

> At no time before the summer of 1998 did the Defendant Angelos Firm affirmatively deny the existence of an agreement between the parties with respect to Plaintiffs' entitlement to share in the total attorneys' fees. Plaintiffs relied in good faith upon the repeated representations made by the Defendant of its intention to make such a payment to the Plaintiffs in addition to the hourly rate agreed to by the parties in the contract of March 4, 1996 and its subsequent modification on February 14, 1997. *As a result, the Defendant should be estopped from denying the existence of a valid and enforceable agreement between the parties with respect to the sharing of the total attorneys' fees generated by the tobacco litigation.*

(J.A. 606) (emphasis added). Second, the Angelos Firm's argument that Edell and his law firm cannot invoke the doctrine of equitable estoppel because they failed to meet the supposed threshold requirement of establishing a clear and definite promise is equally unavailing. This is because the Angelos Firm confuses the doctrine of equitable estoppel from its "distant cousin," the doctrine of promissory estoppel. *Pavel Enters., Inc. v. A.S. Johnson Co.,* 342 Md. 143, 674 A.2d 521, 523 n. 1 (1996). As Edell and his law firm point out, the two theories have different elements. Indeed, Maryland's highest court has described the two theories as "distant cousins." Promissory estoppel offers a vehicle to enforce a promise for which there is no consideration, but the plaintiff nonetheless relied upon the promise to his detriment in circumstances that make it unconscionable not to enforce the promise. *Allen M. Campbell Co. v. Virginia Metal Indus., Inc.,* 708 F.2d 930, 931 (4th Cir.1983). A

clear and definite promise on the part of the defendant is an essential element of a promissory estoppel claim. *Pavel Enters., Inc.*, 674 A.2d at 532. Such is not the case with respect to invocation of the doctrine of equitable estoppel, which relates to misrepresentations of fact, positive acts, and omissions. *Canaras v. Lift Truck Services, Inc.*, 272 Md. 337, 322 A.2d 866, 878 (1974); *J.F. Johnson Lumber Co. v. Magruder*, 218 Md. 440, 147 A.2d 208, 212 (1958); *Ganley*, 409 A.2d at 764.

We now turn to address Edell and his law firm's argument based upon MLRPC 1.5(e) and *Post v. Bregman*, 349 Md. 142, 707 A.2d 806 (1998). Edell and his law firm concede, as they must, that they *never* reached an express agreement with the Angelos Firm regarding the specific percentage they would receive of any contingency fee the Angelos Firm might receive at the conclusion of the Maryland AG Action. Nevertheless, as previously stated, Edell and his law firm argue that because the Angelos Firm agreed that they would share in any contingency fee that it might receive at the conclusion of the Maryland AG Action in exchange for their continued substantial participation in the case, MLRPC 1.5(e) implies, by operation of law, that the sharing would be in proportion to the services they performed. In other words, once the Angelos Firm agreed to any sharing of the potential contingency fee, MLRPC 1.5(e) deems them to have agreed to pay Edell and his law firm the only percentage of that potential contingency fee to which it could ethically agree.

On the merits, the Angelos Firm opposes this argument on the basis that it incorrectly presupposes the existence of a fee-sharing agreement in violation of its non-assignment obligation under its fee agreement with Maryland and in violation of the well-settled Maryland precedent that an enforceable contract does not exist unless the parties have agreed to all material terms of the contract sought to be enforced, *Beck*, 81 A.2d at 609. The Angelos Firm insists that because it did not and would not agree to any division of the contingency fee that it might receive at the conclusion of the Maryland AG Action, considerations associated with MLRPC 1.5(e) never materialized and must be regarded as purely academic.

Before we address these opposing arguments, a discussion of *Post* is warranted. In *Post*, an attorney brought an action seeking a declaratory judgment that a fee-sharing agreement entered into with a referring attorney violated MLRPC 1.5(e) because the referring attorney had done insufficient work on the case to warrant a fee in the amount specified in the fee-sharing agreement. *Post*, 707 A.2d at 808. In other words, the fee due the referring attorney under the fee agreement was allegedly not in proportion to the legal services he actually rendered in the case as required by MLRPC 1.5(e).

The referring attorney denied that the fee due him under the fee-sharing agreement overstated the portion of his actual legal services in the case, and therefore, denied that MLRPC 1.5(e) would be violated by enforcement of that agreement. *Post*, 707 A.2d at 810–811. Additionally, the referring attorney contended that MLRPC 1.5(e) was merely an ethical rule only enforceable through the attorney grievance mechanism. *Post*, 707 A.2d at 812. The referring attorney filed a two-count counterclaim for declaratory judgment and for breach of contract. The case ultimately reached the Court of Appeals of Maryland based upon the Maryland Court of Special Appeals' affirmance, *Post v. Bregman*, 112 Md.App. 738, 686 A.2d 665 (1996), of the circuit court's grant of summary judgment in favor of the referring

attorney, entry of judgment in his favor on the breach of contract counterclaim, and dismissal of the opposing declaratory judgment claim as moot. *Post,* 707 A.2d at 808.

For reasons irrelevant to the present appeal, the Court of Appeals of Maryland refused to address the referring attorney's denial that MLRPC 1.5(e) would be violated by enforcement of the fee-sharing agreement. *Post,* 707 A.2d at 814. Instead, it addressed the extent to which MLRPC 1.5(e) governs private agreements entered into by lawyers. *Post,* 707 A.2d at 817. On this issue, the court held that MLRPC 1.5(e) "does constitute a supervening statement of public policy to which fee-sharing agreements by lawyers are subject, and that the enforcement of Rule 1.5(e) is not limited to disciplinary proceedings." *Post,* 707 A.2d at 818. Based upon this holding, the court held that a fee-sharing agreement that violates MLRPC 1.5(e) may be unenforceable, provided that the violation is not "merely technical, incidental, or insubstantial." *Post,* 707 A.2d at 819. The court concluded:

> We view a violation of Rule 1.5(e), whether regarded as an external defense or as incorporated into the contract itself, as being in the nature of an equitable defense, and principles of equity ought to be applied.

*Post,* 707 A.2d at 819.[6] The court's rationale for these holdings is that "it would indeed be at least anomalous to allow a lawyer to invoke the court's aid in enforcing an unethical agreement when that very enforcement, or perhaps even the existence of the agreement sought to be enforced, would render the lawyer subject to discipline." *Id.* at 818. Based upon its holdings, the Court of Appeals of Maryland reversed the judgment of the Maryland Court of Special Appeals and remanded the case to that court with instructions to remand to the circuit court for further proceedings in accordance with its opinion. *Id.* at 819.

We see no reason why the legal principles announced by the Maryland Court of Appeals in *Post* should not apply to the present action. Thus, we hold Edell and his law firm should be permitted to assert MLRPC 1.5(e) as an equitable defense to the Angelos Firm's argument that the contract fails for lack of agreement to a material term, which defense must be evaluated according to the equitable considerations outlined in *Post. Id.* at 819. Of course, the nature of those equitable considerations would require a jury to resolve factual issues raised by those considerations before actually considering the mer-

---

6. The *Post* court held that when presented with a defense resting on MLRPC 1.5(e), a court must look to all of the circumstances. *Post,* 707 A.2d at 819. In this regard, the court specified the following circumstances:

   (1) the nature of the alleged violation,

   (2) how the violation came about,

   (3) the extent to which the parties acted in good faith,

   (4) whether the lawyer raising the defense is at least equally culpable as the lawyer against whom the defense is raised and whether the defense is being raised simply to escape an otherwise valid contractual obligation,

   (5) whether the violation has some particular public importance, such that there is a public interest in not enforcing the agreement,

   (6) whether the client, in particular, would be harmed by enforcing the agreement, and, in that regard, if the agreement is found to be so violative of the rule as to be unenforceable, whether all or any part of the disputed amount should be returned to the client on the ground that, to that extent, the fee is unreasonable, and

   (7) any other relevant considerations.

*Id.*

its of the defense itself in connection with the Angelos Firm's opposition to Edell and his law firm's breach of contract claim.

The major factual distinction between *Post* and the present action is that, in *Post,* the parties had actually agreed to the particular fee-splitting percentages, while in the present action they have not. Nevertheless, the Court of Appeals of Maryland's rationale in *Post* for allowing the assertion of Rule 1.5(e) as an equitable defense applies equally in the present action. In this regard, we rely on our holding that a reasonable jury could find that a contract existed between Edell and his law firm and the Angelos Firm, whereby the Angelos Firm agreed that Edell and his law firm would share fairly (in addition to the hourly-rate fees agreed upon) in any contingency fee that it might receive at the conclusion of the Maryland AG Action. Based upon this holding, to prevent Edell and his law firm from asserting MLRPC 1.5(e) as an equitable defense to the Angelos Firm's refusal to pay Edell and his law firm a share (in proportion to the legal services they performed in the case) of any contingency fee that it might ultimately receive would allow the Angelos Firm to invoke the court's aid in avoiding an obligation implied by law, when any basis for splitting the fee other than proportionally, would be unethical. Indeed, *Post* expressly contemplates the assertion of MLRPC 1.5(e) as being incorporated into a contract as one way in which a party can use MLRPC 1.5(e) as an equitable defense. *Post,* 707 A.2d at 819.

We also note that sufficient evidence exists in the record to establish the other express elements of MLRPC 1.5(e). The subject of the contract sought to be enforced by Edell and his law firm is the

division of a fee between lawyers who are not in the same firm and Edell and his law firm do not have a written agreement with Maryland. *Id.* ("A division of fee between lawyers who are not in the same firm may be made only if: (1) the division is in proportion to the services performed by each lawyer or, by written agreement with the client, each lawyer assumes joint responsibility for the representation...."). In compliance with MLRPC 1.5(e)(2), the client, Maryland, was advised of Edell and his law firm's participation in the Maryland AG Action and did not object. Finally, the ongoing litigation between the Angelos Firm and Maryland will give rise to a judicial determination of a reasonable contingency fee in compliance with MLRPC 1.5(e)(3).

Moreover, allowing Edell and his law firm to assert MLRPC 1.5(e) as an equitable defense is not inconsistent with the general rule in Maryland that an enforceable contract does not exist unless the parties have agreed to all material terms of the contract sought to be enforced. *Beck,* 81 A.2d at 609. This is because neither of the two rationales for the rule are implicated by allowing Edell and his law firm to assert MLRPC 1.5(e) as an equitable defense in the present action. First, the missing term sought to be supplied is implied by law rather than the court. Thus, the court in the present action would not be in the business of making a contract for parties. Second, the fee sharing in proportion to legal services rendered requirement of MLRPC 1.5(e) is sufficiently definite for enforcement. Any factual dispute regarding the actual proportion of the legal services rendered may be resolved by the trier of fact. We estimate that this type of dispute is often the subject of a breach of contract claim.[7]

7. We also reject the Angelos Firm's argument regarding the non-assignment of its rights un-

der its fee agreement with Maryland. As explained previously, the contract sought to be

In conclusion, with respect to Edell and his law firm's breach of contract claim, we vacate the district court's grant of summary judgment in favor of the Angelos Firm and remand for further proceedings consistent with this opinion.

## IV

Next, Edell and his law firm contend the district court erred in granting summary judgment in favor of the Angelos Firm with respect to their claim alleging breach of the alleged implied covenant of good faith and fair dealing in the performance of the contract, which contract is the subject of their common law contract claim. We affirm.

�рж Maryland law recognizes an implied covenant of good faith and fair dealing in contracts. *Eastern Shore Mkts., Inc. v. J.D. Assocs., Ltd. P'ship*, 213 F.3d 175, 182–83 (4th Cir.2000). However, the covenant *is limited to* prohibiting one party from acting in such a manner as to prevent the other party from performing his obligations under the contract. *Id.* The covenant does not extend to imply a general duty of good faith and fair dealing in the performance of obligations under the contract that do not implicate or impair another party's performance under the contract. *See id.*

▬ Here, Edell and his law firm do not allege that the Angelos Firm prevented them from performing their obligations under the alleged contract at issue. Rather, their claim seeks redress for the Angelos Firm's alleged lack of good faith and fair dealing in performing its obligations

under the alleged contract. Accordingly, the claim is not cognizable under Maryland law. We, therefore, affirm the district court's disposition of this claim.

## V

Edell and his law firm next contend the district court erred in granting summary judgment in favor of the Angelos Firm with respect to their intentional misrepresentation claim. We agree and, therefore, vacate the district court's grant of summary judgment with respect to this claim and remand for further proceedings consistent with this opinion.

Edell and his law firm's intentional misrepresentation claim alleges that the Angelos Firm induced them to perform ever increasing amounts of legal services in the Maryland AG Action at the cost of working on other fee-generating cases by intentionally misrepresenting on numerous occasions that they would share fairly (in addition to any fees paid them on an hourly basis) in any contingency fee that the Angelos Firm might receive at the conclusion of the Maryland AG Action. This claim is an alternative claim to their breach of contract claim.

▬ In order for a plaintiff to prevail upon an intentional misrepresentation claim under Maryland common law, the plaintiff must establish the following facts by clear and convincing evidence:

(1) that the defendant made a false representation to the plaintiff,

(2) that its falsity was either known to the defendant or that the representation

---

enforced by Edell and his law firm does not involve the Angelos Firm's assignment of any of its rights under its fee agreement with Maryland.

Additionally, we reject the Angelos Firm's argument that Edell and his law firm failed to

preserve for appellate review their argument based upon MLRCP 1.5(e) and *Post*. The record reveals that Edell and his law firm sufficiently pressed the substance of the argument below to preserve it for our review.

was made with reckless indifference as to its truth,

(3) that the misrepresentation was made for the purpose of defrauding the plaintiff,

(4) that the plaintiff relied on the misrepresentation and had the right to rely on it, and

(5) that the plaintiff suffered compensable injury resulting from the misrepresentation.

*Nails v. S & R, Inc.*, 334 Md. 398, 639 A.2d 660, 668 (1994); *Dixon v. Process Corp.*, 38 Md.App. 644, 382 A.2d 893, 900 (1978). Of relevance in the present action, clear and convincing proof of promissory or predictive statements, made with the present intention not to perform, satisfy the first and second elements of this test. *See Miller v. Fairchild Indus.*, 97 Md.App. 324, 629 A.2d 1293, 1302 (1993). The reliance element is met if the plaintiff establishes by clear and convincing evidence that the misrepresentation "substantially induced [him] to act." *Nails*, 639 A.2d at 669. Thus, the plaintiff need not establish that the misrepresentation was the only motivation for his actions. *Id.*

In its appellate brief, the Angelos Firm characterizes the assurances of sharing fairly (in addition to the hourly-rate fees agreed upon) in any contingency fee the Angelos Firm might receive at the conclusion of the Maryland AG Action as merely predictive statements that failed to materialize because Peter "Angelos was 'put off' by Edell's fee-sharing demands, and ultimately changed his mind." (Angelos Firm's Br. at 46) (internal citation omitted). Additionally, the Angelos Firm makes the following arguments in support of the district court's grant of summary judgment with respect to this claim: (1) Edell and his law firm failed to produce evidence demonstrating that Smouse's assurances of sharing fairly (in addition to

the hourly-rate fees agreed upon) in any contingency fee the Angelos Firm might receive at the conclusion of the Maryland AG Action reflected false intentions when made; (2) all of the assurances relied upon post date Edell and his law firm's performance in the Maryland AG Action under the March 1996 Compensation Agreement, and, therefore, could not have induced them to undertake any action; (3) any reliance upon these assurances was unreasonable because Smouse did not have exclusive control over the future decisions of Peter Angelos; and (4) any reliance upon these assurances was unreasonable in light of the non-assignment of rights clause in the Angelos Firm's fee agreement with Maryland.

■ Edell and his law firm have proffered sufficient evidence to survive a motion for summary judgment with respect to their intentional misrepresentation claim. Viewing the evidence in the light most favorable to Edell and his law firm, as we must at the summary judgment stage, *Reeves*, 530 U.S. at 149–150, 120 S.Ct. 2097, reveals a masterful plan by the Angelos Firm to fraudulently benefit from Edell's undisputed reputation and experience as a tobacco litigation expert by luring him and his law firm into falsely believing the Angelos Firm would share fairly (in addition to the hourly-rate fees agreed upon) any contingency fee it might receive at the conclusion of the Maryland AG Action if they continued their substantial participation in the case at the expense of working on other fee-generating cases. The fact that the false assurances at issue post date the March 1996 Compensation Agreement is of no moment. This is because the assurances were critical in inducing Edell and his law firm to continue to devote far greater time to the litigation beyond the amount of time they had agreed to devote in the March 1996 Com-

pensation Agreement. The Angelos Firm's argument that Smouse did not have exclusive control over the future decisions of Peter Angelos is yet more fodder for closing argument. And finally, the Angelos Firm's unreasonable reliance argument based upon the non-assignment clause in its fee agreement with Maryland misses the mark. Edell and his law firm have never claimed the Angelos Firm agreed to assign them any of it rights under that agreement.

In conclusion, we vacate the district court's grant of summary judgment in favor of the Angelos Firm with respect to the intentional misrepresentation claim and remand that claim for further proceedings consistent with this opinion.

## VI

Finally, Edell and his law firm contend the district court abused its discretion by refusing to grant them leave to amend their complaint to add a negligent misrepresentation claim. We agree.

■■■ Under Federal Rule of Civil Procedure 15(a), leave to amend a complaint "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). Indeed, we have recognized that leave to amend a complaint should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile. *Edwards v. City of Goldsboro*, 178 F.3d 231, 242 (4th Cir.1999). We review a district court's

refusal to grant leave to amend a complaint for abuse of discretion. *Id.*

■■■ Here, Edell and his law firm filed their motion for leave to amend their complaint simultaneously with their opposition to the Angelos Firm's motion for summary judgment. Although the district court determined that granting the motion would not prejudice the Angelos Firm, it nonetheless denied the motion on the basis of futility. According to the district court, the motion was futile because the record contained insufficient evidence to establish the false statement element of a negligent misrepresentation claim under Maryland common law, *Gross v. Sussex, Inc.*, 332 Md. 247, 630 A.2d 1156, 1162 (1993).[8]

■■■ On appeal, the Angelos Firm urges us to affirm on the reasoning of the district court. They also add that futility is present with respect to one other element of a negligent misrepresentation claim—justifiable reliance. *Id.* We have already held in the context of Edell and his law firm's intentional misrepresentation claim that sufficient evidence of these two elements exists in the record to survive the Angelos Firm's motion for summary judgment. Accordingly, the futility rationale relied upon by the district court and the Angelos Firm does not sustain the district court's refusal to grant Edell and his law firm leave to amend their complaint to allege a negligent misrepresentation claim. In sum, the district court's refusal was an abuse of discretion. Accordingly, we vacate the district court's denial of Edell and his law firm's leave to amend and remand

---

8. A negligent misrepresentation claim under Maryland common law has five elements:
   (1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement;
   (2) the defendant intends that his statement will be acted upon by the plaintiff;
   (3) the defendant has knowledge that the plaintiff will probably rely on the statement,

which, if erroneous, will cause loss or injury;
   (4) the plaintiff, justifiably, takes action in reliance on the statement; and
   (5) the plaintiff suffers damage proximately caused by the defendant's negligence.
   *Gross*, 630 A.2d at 1162.

the matter to the district court with instructions to grant the motion.

## VII

In summary, we: (1) vacate the district court's grant of summary judgment in favor of the Angelos Firm with respect to the contract claim and remand that claim for further proceedings consistent with this opinion; (2) affirm the district court's grant of summary judgment in favor of the Angelos Firm with respect to the breach of the alleged covenant of good faith and fair dealing; (3) vacate the district court's grant of summary judgment in favor of the Angelos Firm with respect to the intentional misrepresentation claim and remand that claim for further proceedings consistent with this opinion; and (4) vacate the district court's denial of Edell and his law firm's motion for leave to amend their complaint to assert a negligent misrepresentation claim and remand with instructions that the district court grant the motion.

*AFFIRMED IN PART, VACATED IN PART, AND REMANDED FOR FURTHER PROCEEDINGS.*

WIDENER, Circuit Judge, concurring and dissenting:

## I.

I concur in parts I through IV of the majority opinion with respect to Edell's claims for breach of contract and breach of the implied covenant of good faith. I write separately with respect to parts V and VI of the majority opinion, however, because I believe that the district court did not err in granting summary judgment denying Edell's claim for intentional misrepresentation and, as well, denying Edell's motion to amend his complaint.

## II.

I agree with the district court that Edell has failed to offer evidence sufficient to survive a motion for summary judgment on his claim for intentional misrepresentation. Generally, "statements which are merely promissory in nature and expressions as to what will happen in the future are not actionable as fraud." *Miller v. Fairchild Indus., Inc.,* 97 Md.App. 324, 629 A.2d 1293, 1302 (Md.1993) (internal quotations omitted). As the majority recognizes, however, the Maryland courts have ruled that misleading promissory or predictive statements may be actionable as intentional misrepresentation if they are "made with a present intention not to perform." *Miller,* 629 A.2d at 1302. Thus, to prevail on his claim for intentional misrepresentation Edell must prove by clear and convincing evidence that each of the promissory statements made by the Angelos law firm was made with no intention to perform. *Gross v. Sussex, Inc.,* 332 Md. 247, 630 A.2d 1156, 1161 (1993) ("[T]he evidence must be such as to constitute proof by clear and convincing evidence."). We have held that where, as in a fraud claim, the nonmoving party must produce clear and convincing evidence to support his claim, that higher evidentiary burden is considered as part of "the summary judgment calculus." *Wells v. Liddy,* 186 F.3d 505, 520 (4th Cir.1999). While it is true that summary judgment is generally an inappropriate vehicle for the resolution of questions of intent and motive, *Brown v. Dermer,* 357 Md. 344, 744 A.2d 47, 53 (2000), I believe, with the district court, that Edell has failed to offer any evidence indicating that the Angelos law firm intended, from the very outset, not to keep its promises.

The majority concludes that the evidence offered by Edell would allow a reasonable jury to infer the existence of a

"masterful plan" to deceive Edell from the beginning. I believe that the majority fails to consider the heightened burden Edell faces on this issue, including the summary judgment stage. Thus, even viewing the evidence in the light most favorable to Edell, I agree with the district court's conclusion that Edell has failed to offer any evidence creating a material issue of fact as to the intent of the Angelos law firm to deceive him from the very beginning of their relationship.

### III.

I also write separately with respect to part VI of the majority's opinion because I believe that the district court did not abuse its discretion by denying Edell's motion to amend his complaint to add a claim for negligent misrepresentation. We review a district court's decision to deny a request for leave to amend for an abuse of discretion. See *Edwards v. City of Goldsboro,* 178 F.3d 231, 242 (4th Cir.1999). The district court denied the motion on the ground that a claim for negligent misrepresentation would be futile. See *Edwards,* 178 F.3d at 242 (noting that delay coupled with a finding of futility may justify denial of a motion to amend).

I agree with the district court's conclusion that Edell's claim for negligent misrepresentation would be futile, but do so for different reasons than those cited by the district court. I note that Edell's claim for negligent misrepresentation is inconsistent with the theory of his entire case. All of the statements, written or oral, on which Edell relies were conscious or deliberate as compared to inadvertent or careless. They simply do not fit the definition of unintentional wrongdoing this cause of action requires. See e.g., *Walpert v. Katz,* 361 Md. 645, 762 A.2d 582, 588 (2000) (noting that a negligent misrepresentation claim must first demonstrate

that "the defendant, owing a duty of care to the plaintiff, *negligently* asserts a false statement.") (emphasis added).

Accordingly, I would affirm the district court's decisions against the plaintiff with respect to his claim for intentional misrepresentation and his motion to amend his complaint to add a claim for negligent misrepresentation. As to those aspects of the case, I respectfully dissent.