PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

CHARLES B. ERWIN,

        *Plaintiff-Appellant,*

        v.

UNITED STATES OF AMERICA,

        *Defendant-Appellee,*

        v.

STEPHEN C. COGGIN; WILLIAM G.
PINTNER; JAMES BARRY LIGHT;
HARTSELL B. LIGHT, JR.,

        *Third Party Defendants.*

No. 08-1564

Appeal from the United States District Court
for the Middle District of North Carolina, at Durham.
James A. Beaty, Jr., Chief District Judge.
(1:06-cv-00059-JAB-WWD)

Argued: September 23, 2009

Decided: January 13, 2010

Before MOTZ, Circuit Judge, HAMILTON, Senior Circuit
Judge, and Irene M. KEELEY, United States District Judge
for the Northern District of West Virginia,
sitting by designation.

---

Affirmed by published opinion. Judge Motz wrote the major-
ity opinion, in which Judge Keeley joined. Senior Judge Ham-
ilton wrote a dissenting opinion.

**COUNSEL**

**ARGUED**: Emma Claire Merritt, TUGGLE, DUGGINS & MESCHAN, PA, Greensboro, North Carolina, for Appellant. Christine Durney Mason, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** J. Nathan Duggins, III, TUGGLE, DUGGINS & MESCHAN, PA, Greensboro, North Carolina, for Appellant. John A. DiCicco, Acting Assistant Attorney General, Kenneth L. Greene, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Anna Mills S. Wagoner, United States Attorney, Greensboro, North Carolina, for Appellee.

---

**OPINION**

DIANA GRIBBON MOTZ, Circuit Judge:

This appeal arises from the district court's imposition of personal liability on Charles Erwin for payroll withholding taxes owed by GC Affordable Dining, Inc. ("GCAD"). Erwin owned a one-third interest in GCAD and served as a GCAD corporate officer and director, and, on behalf of GCAD, selected business sites, hired and fired employees, and negotiated and personally guaranteed loans and other contracts for the company. The district court held as a matter of law that Erwin (1) was responsible for payment of these taxes and (2) willfully failed to pay them. Erwin challenges both holdings on appeal. For the reasons that follow, we affirm.

I.

Over the last 25 years, Erwin, a North Carolina entrepreneur, has owned or operated at least 60 restaurants. In June 1994, Erwin joined with three other North Carolina businessmen—Geoffrey Grenert, Stephen Coggin, and John Miracle—to form GCAD, a franchisee of Golden Corral

Franchising System, Inc. ("Golden Corral"). GCAD eventually opened and operated five Golden Corral restaurants.

At GCAD's founding, Erwin and Grenert each owned one third of the corporate stock; Coggin and Miracle each owned one sixth of the stock. Shortly thereafter, Grenert left the enterprise; eventually, Miracle sold his interest in GCAD to Mark Cole. But at all times, Erwin retained at least a one-third interest in the company.

In addition to owning all of the corporate stock in GCAD, Erwin and his partners served as its directors and officers. Coggin served as president, Miracle (and later Cole) as vice president, and Erwin as vice president, secretary, and treasurer.[1] The partners hired two managers to oversee day-to-day operations, payroll, and accounting.

In early 1995, Erwin and his partners—along with their wives—personally guaranteed construction and operating lines of credit with First Union Bank for GCAD. Erwin and his partners also secured a construction line of credit for a corporation, Tiffany, LLC, which they established as a flow-through real estate holding company for GCAD. Tiffany leased or purchased land and equipment for the restaurants; GCAD, in turn, leased the land and equipment from Tiffany.

Erwin participated in selecting sites for the restaurants and signed lease-related documents for all restaurant locations on behalf of both Tiffany and GCAD. Erwin also personally guaranteed rent payments on at least four of the leases, and personally guaranteed lines of credit from food vendors for the benefit of the GCAD restaurants.

Despite early profits, the GCAD restaurants soon began to

---

[1] In his original IRS claim, Erwin did not acknowledge his service as treasurer of GCAD. In deposition, however, he conceded that he had held that position.

lose money. In January 1997, Erwin and his partners decided to fire one of the original day-to-day managers and consolidate operations under the other. Erwin expressly acknowledged his "involve[ment]" in both decisions. During 1997, Erwin conferred at least weekly with Coggin regarding GCAD's affairs. Moreover, Erwin and his partners met monthly during 1997, and at least quarterly in 1998, to discuss GCAD matters. In an effort to improve business, Erwin also visited the GCAD restaurants and met with store managers during 1997 and 1998.

Unfortunately, business did not improve. GCAD had a negative operating cash flow of $2 million by the end of 1997, and thus had difficulty paying its creditors. In early 1998, Erwin and Coggin negotiated a payment plan to settle GCAD debts owed to one food vendor, LoPresti, with whom Erwin had personally guaranteed GCAD's line of credit.

During this period, Erwin and his partners decided to replace the remaining original manager with William Pintner, a seasoned Golden Corral employee. On a weekly basis, Pintner and Erwin discussed sales figures and strategies to increase profits.[2] Early in Pintner's tenure, he recommended that the partners fire their accountant and hire Barry and Buddy Light (the "Light brothers") to handle accounting and payroll for GCAD; the partners followed this advice.

Despite these efforts, GCAD continued to lose money. In December 1998, Erwin and his partners learned that the Light brothers had failed to pay the entire quarterly payroll tax withholdings for the third quarter of 1998. The partners made a

---

[2]Pintner testified in deposition that he spoke to Erwin daily regarding sales and the performance of individual stores, and that Erwin visited the stores every month or two. Pintner further testified that Erwin directed the payment of GCAD's bills. As to the latter claim, in deposition, Erwin neither admitted nor expressly denied Pintner's testimony, testifying only, "I can't say whether I ever [directed payment of bills]. I know it was not a practice."

capital call for approximately $150,000 and wired the money to the Light brothers with instructions. Erwin, who contributed $95,000 of the $150,000, testified that he personally instructed the Light brothers "that absolutely under no circumstances whatsoever were [the Light brothers] ever to be late with any taxes." Despite Erwin's admonition, the Light brothers failed to pay in full the payroll taxes for the fourth quarter of 1998.

Coggin testified that in late 1998, he and Erwin also sent the Light brothers $50,000 for additional payment to the favored food vendor, LoPresti, and instructed the Light brothers *not* to pay the rent because Erwin and Coggin themselves would handle the rent payments directly. Erwin never testified to the contrary.

Also in late 1998, Erwin became involved in negotiations —which became final in May 1999—to release GCAD from obligations under one of its leases. The landlord, seeking to terminate the lease to accommodate another party, agreed to wire $1.65 million to CNL American Properties Fund, Inc. ("CNL"), a company financing GCAD's restaurant building and equipment, to cover rents GCAD owed CNL on that and other leases. At that time GCAD—and Erwin as personal guarantor—owed CNL substantial rental payments.

GCAD's financial condition continued to worsen throughout 1999, and GCAD did not pay in full its withholding taxes for the first three quarters of that year. In August 1999, Erwin and his two partners learned of this latest delinquency. In December 1999, the partners made another capital contribution of $50,000 to help cure these deficiencies, but GCAD never paid the taxes in full. Nevertheless, Erwin and his partners continued to employ the Light brothers.

In February 2000, Erwin and his partners finally fired the Light brothers. After doing so, Erwin decided to take control of GCAD accounting functions, including payroll. He moved

GCAD's financial operations from Ohio to the North Carolina offices of his solely owned company, Chelda. After that time, GCAD remained current on its payroll withholding payments. In late 2000, Erwin became the 100 percent owner of GCAD; shortly thereafter he dissolved the corporation. Between August 1999 and the close of business in 2000, the GCAD restaurants generated approximately $5 million in sales revenue. Rather than paying the outstanding 1998 and 1999 tax deficiencies, however, GCAD continued to pay rent and supplier expenses. Erwin acknowledged that, pursuant to his direction, GCAD paid its landlord and suppliers rather than the IRS; he maintained that GCAD did so because this was the only way to remain in business.

Following the demise of GCAD, the IRS assessed tax deficiencies against Erwin in the amount of the unpaid payroll withholding taxes owed by GCAD. Erwin paid a portion of the assessed amounts and then brought this action against the United States to recover those amounts. The Government counterclaimed for $264,579, the amount of GCAD's unpaid deficiencies from the fourth quarter of 1998 and the first three quarters of 1999, plus interest. The United States subsequently filed third-party complaints against Coggin, Pintner, and the Light brothers.

The parties filed cross motions for summary judgment. The district court, adopting the recommendation of the magistrate judge, denied Erwin's motion and granted the Government's. The court also granted the Government's motions to issue a final judgment against Erwin and stay the proceedings against Coggin, Pintner, and the Light brothers pending the outcome of Erwin's anticipated appeal.

Erwin timely noted this appeal.

## II.

The Internal Revenue Code requires employers to withhold social security and federal excise taxes from their employees'

wages. *See* 26 U.S.C. §§ 3402(a), 3102(a) (2006); *Plett v. United States*, 185 F.3d 216, 218 (4th Cir. 1999). The employer holds these monies in trust for the United States. 26 U.S.C. § 7501(a) (2006). Accordingly, courts often refer to the withheld amounts as "trust fund taxes"; these monies exist for the *exclusive* use of the government, not the employer. *See Plett*, 185 F.3d at 218. Payment of these trust fund taxes is "no[t] excuse[d]" merely because "as a matter of sound business judgment, the money was paid to suppliers . . . in order to keep the corporation operating as a going concern—the government cannot be made an unwilling partner in a floundering business." *Collins v. United States*, 848 F.2d 740, 741–42 (6th Cir. 1988).

The Code "assure[s] compliance by the employer with its obligation . . . to pay" trust fund taxes by imposing personal liability on officers or agents of the employer responsible for "the employer's decisions regarding withholding and payment" of the taxes. *Slodov v. United States*, 436 U.S. 238, 247 (1978) (interpreting 26 U.S.C. § 6672 (2006)). To that end, § 6672(a) of the Code provides that "[a]ny person required to collect, truthfully account for, and pay over any tax . . . who willfully fails" to do so shall be personally liable for "a penalty equal to the total amount of the tax evaded, or not . . . paid over." 26 U.S.C. § 6672(a). Although labeled as a "penalty," § 6672 does not actually punish; rather, it "brings to the government only the same amount to which it was entitled by way of the tax." *Turnbull v. United States*, 929 F.2d 173, 178 n.6 (5th Cir. 1991) (internal quotation marks omitted).

Personal liability for a corporation's trust fund taxes extends to any person who (1) is "responsible" for collection and payment of those taxes, and (2) "willfully fail[s]" to see that the taxes are paid. *Plett*, 185 F.3d at 218; *O'Connor v. United States*, 956 F.2d 48, 50 (4th Cir. 1992). Once the Government assesses a taxpayer for this liability, the taxpayer has the burden of proof at trial on both elements of § 6672 liability. *See O'Connor*, 956 F.2d at 50.

But we review *de novo* a district court's grant of summary judgment to the Government, resolving all disputed facts in favor of the taxpayer. *See O'Connor*, 956 F.2d at 50. Of course, to defeat summary judgment, the taxpayer (like any other litigant) must identify an error of law or a genuine issue of material fact; the taxpayer cannot create a material fact by reliance on conclusory allegations or bare denials. *See* Fed. R. Civ. P. 56(c), (e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *see also Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). Moreover, a material fact is one "that might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.

"[I]n the absence of disputed *material* facts, summary judgment represents a favored mechanism to secure the 'just, speedy, and inexpensive determination'" of taxpayer liability under § 6672. *Plett*, 185 F.3d at 223 (quoting Fed. R. Civ. P. 1); *see also Barnett v. IRS*, 988 F.2d 1449, 1454 & n.10 (5th Cir. 1993) (stating that, although the facts in a § 6672 analysis are critical, "extensive caselaw . . . narrowly constrains a fact-finder's province in § 6672 cases," and noting that for this reason "countless courts have found responsibility [for purposes of § 6672] as a matter of law").[3]

With these principles in mind, we turn to Erwin's contention that the district court erred in holding, as a matter of law, that Erwin (1) was a person responsible for the payment of GCAD's withholding taxes, and (2) willfully failed to pay those taxes. We consider each argument in turn.

---

[3]*See generally* C.T. Drechsler, Annotation, *Construction, Application, and Effect, with Respect to Withholding, Social Security, and Unemployment Compensation Taxes, of Statutes Imposing Penalties for Tax Evasion or Default*, 22 A.L.R.3d 8, § 4 & Supp. (1968) (collecting cases in which courts have found responsibility for § 6672 purposes as a matter of law); Edward A. Nolfi, Annotation, *When Are Persons Other Than Owners, Directors, Officers, and Employees Potentially Liable for Penalties Under IRC § 6672 (26 U.S.C.A § 6672), Concerning Failure to Collect and Pay Over Tax*, 84 A.L.R. Fed. 170, §§ 3-31 & Supp. (1987) (same).

III.

Although the Code defines a responsible person as one "required to collect, truthfully account for, *and* pay over any tax," 26 U.S.C. § 6672(a) (emphasis added), the Supreme Court has interpreted this language to apply to all "persons responsible for collection of third-party taxes and not . . . [only] to those persons in a position to perform all three of the enumerated duties." *Slodov*, 436 U.S. at 250. Thus, the Code deems anyone required to "collect" *or* "account for" *or* "remit" taxes a "responsible person" for purposes of § 6672. *See Plett*, 185 F.3d at 219.

More than one person may be held responsible for a corporation's payroll taxes. Indeed, "[t]he term 'responsible person' is broad and may include many individuals connected with a corporation." *O'Connor*, 956 F.2d at 50; *see also Barnett*, 988 F.2d at 1455 ("[T]here usually are . . . multiple responsible persons in any company."). Assessing whether a "person has the statutorily imposed duty to make the tax payments" constitutes the "key element" in determining responsible person status. *O'Connor*, 956 F.2d at 51. "This duty is considered in light of the person's authority over an enterprise's finances or general decision making[,] . . . [and] is generally found in high corporate officials charged with general control over corporate business affairs who participate in decisions concerning payment of creditors and disbursement of funds." *Id.* (citation omitted).

Titular authority alone does not establish responsible person status. Rather, the proper inquiry focuses "on substance rather than form." *Id.* "The substance of the circumstances must be such that the officer exercises and uses his authority over financial affairs or general management, or is under a duty to do so, before that officer can be deemed to be a responsible person." *Id.* Put another way, the essential inquiry is whether a person has significant, but not necessarily exclusive, authority over corporate finances or management deci-

sions. *See Plett*, 185 F.3d at 222; *see also Kinnie v. United States*, 994 F.2d 279, 283-84 (6th Cir. 1993).

We have developed a non-exhaustive list of factors to consider in determining whether "the substance of the circumstances" establishes responsible person status under § 6672. Thus, we examine whether the employee (1) served as an officer or director of the company; (2) controlled the company's payroll; (3) determined which creditors to pay and when to pay them; (4) participated in the corporation's day-to-day management; (5) had the ability to hire and fire employees; and (6) possessed the power to write checks. *Plett*, 185 F.3d at 219; *see also O'Connor*, 956 F.2d at 51. No single factor controls; rather, we consider the "totality of the circumstances." *See Vinick v. United States*, 205 F.3d 1, 8 (1st Cir. 2000); *see also Barnett*, 988 F.2d at 1455; *O'Connor*, 956 F.2d at 51.

In this case, the undisputed facts demonstrate that Erwin was a "responsible person" for § 6672 purposes with respect to GCAD's payroll taxes. While not *every Plett* factor so indicates, most do. Moreover, the totality of the circumstances conclusively establishes that Erwin had the "effective power" to pay the taxes owed by GCAD. *Barnett*, 988 F.2d at 1454.

As to the first factor, it is undisputed that Erwin founded and served as an officer of GCAD. In fact, Erwin continually served as secretary, treasurer, vice-president, and director of the corporation throughout its existence and, at all times, owned at least a one-third interest in GCAD. Although Erwin asserts that he acted as a mere "passive investor[] who contributed capital and [only] held the title[s] to protect his interest in the venture," the evidence establishes that in fact his involvement in GCAD was substantial. Erwin was the only GCAD owner with any experience in the restaurant business, and he himself acknowledged in deposition his active involvement in corporate decisions.

With respect to the second factor, although Erwin and his two partners did not directly manage GCAD's payroll, they exercised substantial supervisory authority over the management team—Pintner and the Light brothers—who did control payroll. Moreover, Erwin conceded that he participated in setting financial policy for GCAD and, on occasion, directed payment of GCAD's withholding taxes. *See Kinnie*, 994 F.2d at 284 (stating that a taxpayer need not "always exercise his powers" to remain responsible for seeing that withholding taxes are paid, and "may not escape liability by delegating the task of paying over the taxes to someone else").

Furthermore, within months of learning of GCAD's tax deficiencies, Erwin took complete control of GCAD's financial operations, which establishes his authority to do so. Erwin himself had no doubt as to his authority over the company's payroll, testifying that, had he learned of the Light brothers' failures to remit payroll withholding taxes during the first quarter of 1999, "a lot of things would have happened differently." Erwin testified that he would have taken remedial action at that time, noting that "as soon as [he] did find out" about the deficiencies, "[he] did bring all the accounting back to [his] office." Although Erwin did not seize control of GCAD during the tax periods at issue here, his subsequent exercise of authority over all of GCAD's financial operations certainly "cast[s] light on" the question of whether he was "a responsible person" during those periods. *Vinick*, 205 F.3d at 11 n.8.

With respect to the third factor, the undisputed facts demonstrate that Erwin, along with Coggin, indeed determined, on more than one occasion, which GCAD creditors to pay and when to pay them. In January 1998, Erwin and Coggin negotiated a payment plan with a food vendor, LoPresti, to pay debt owed by GCAD on a line of credit, which Erwin had personally guaranteed. Later in that same year, Erwin and Coggin infused $50,000 into GCAD, directing more payments to LoPresti and (according to Coggin and undisputed by Erwin

himself) took over the rent payments to CNL, a GCAD land-lord whose rent payments Erwin had also personally guaranteed. Moreover, from December 1998 through May 1999, Erwin, along with Coggin, negotiated a buy-out of one of GCAD's leases, which resulted in an additional payment of $1.65 million to CNL to cover rent owed on that and other leases.

Thus, during the tax periods at issue, Erwin actively negotiated substantial payments to GCAD creditors on lines of credit and loans, some of which he had personally guaranteed. Erwin's personal guarantees of these lines of credit and other debts do not alone establish his status as a responsible person. But the undisputed evidence that Erwin negotiated payments to these preferred creditors offers additional strong support for the conclusion that he "use[d] his authority over financial affairs" of GCAD. *O'Connor*, 956 F.2d at 51. In this way, he again acted as a "responsible person" for purposes of § 6672 during the tax periods in question.

GCAD's dealings with the IRS further demonstrate Erwin's control over the company's financial priorities. In December 1998 and again in December 1999, Erwin and his partners infused capital into GCAD and explicitly directed the Light brothers to use that money to pay back taxes. Erwin testified that he personally instructed the Light brothers to stay current with GCAD's payroll withholdings.[4] Erwin also testified that in 2000, when GCAD had significant revenues, he made the business decision to keep the restaurants' doors open by paying the landlord and suppliers instead of paying the back taxes that GCAD owed from previous years.

As to the fourth factor, Erwin did not play the *most* active

---

[4]In deposition, Erwin maintained that the Light brothers withheld information, making it difficult to monitor GCAD's finances. It is undisputed, however, that Erwin had the authority to demand financial information and to fire the Light brothers, as he ultimately did.

role in the day-to-day management of the corporation during the relevant tax periods; rather he delegated much day-to-day authority to others. But, of course, "delegation will not relieve one of responsibility." *Purcell v. United States*, 1 F.3d 932, 937 (9th Cir. 1993); *see also Kinnie*, 994 F.2d at 284. Moreover, the undisputed facts establish that Erwin did involve himself in the company's general decision making and never was, as he claims, a mere passive investor. *Cf. O'Connor*, 956 F.2d at 51-52 (finding question of fact as to responsible person status when "passive investor" did not exercise authority in managing the company, did not dictate the financial decisions of the company, and had no authority to do so).

Erwin helped to choose sites for the corporation's restaurants, negotiated and signed leases and other contracts on behalf of the corporation, personally guaranteed lines of credit and rent payments for the corporation, met with its restaurant managers, and involved himself in negotiating payment plans and buy-outs with corporate creditors. Thus, albeit to a lesser extent than others, Erwin participated in the day-to-day management of the corporation.[5]

Consideration of the fifth factor—hiring and firing power—also demonstrates that Erwin was a "responsible person" for § 6672 purposes. Erwin himself acknowledged that he was involved in the hiring and firing of both sets of accountants and of all upper-level management. Indeed, in early 2000 Erwin took full control of the company's operations and ultimately made the decision to close GCAD. Of course the latter conduct did not occur during the tax periods in issue, but it is nonetheless relevant in establishing that Erwin was a con-

---

[5]Notably, Erwin's involvement in the regular affairs of the company increased when Pintner came on board in early 1998, as Erwin went from communicating monthly with the prior manager to having weekly discussions with Pintner regarding sales figures. *Cf. Vinick*, 205 F.3d at 5 (noting taxpayer, deemed not to be a responsible person, became *less* involved in the affairs of the corporation during the non-payment periods).

sistently active presence in important personnel decisions at GCAD during its entire existence.

With respect to the sixth factor, we agree with Erwin that the record does not demonstrate that he had check-writing authority for GCAD during the relevant tax periods. Although this factor weighs in favor of Erwin, we must consider it in the "totality of the circumstances." *See Vinick*, 205 F.3d at 8; *see also Barnett*, 988 F.2d at 1455; *O'Connor*, 956 F.2d at 51. Those circumstances include *inter alia* Erwin's exercise of authority over GCAD's finances by directing certain payments to privileged creditors during the tax periods in question, and taking over GCAD's day-to-day financial operations and exercise of ultimate check-writing authority immediately after the tax periods in question. Taken together, the undisputed facts of the case clearly evidence that during the relevant tax periods Erwin had the power to exercise check-writing authority had he chosen to do so. *Compare Plett*, 185 F.3d at 222 (finding "financial control . . . indisputably in the hands of [the taxpayer]"), *with Vinick*, 205 F.3d at 11 (explaining that determining responsibility goes to "the central question of power" and emphasizing that "[a]t no time did [the taxpayer] exercise any decision-making authority over which creditors [the corporation] paid").

Although in some cases questions as to responsible person status under § 6672 cannot be resolved at summary judgment, *see, e.g.*, *O'Connor*, 956 F.2d at 51-52,[6] in this case they

---

[6]Erwin mistakenly places heavy reliance on *O'Connor*, in which the taxpayer, although a fifty-percent owner of the corporation, did not dictate any of the company's financial decisions or set its financial policy, did not decide which creditors should be paid, did not participate in any of the company's operational management, and did not hire or fire employees. *See O'Connor*, 956 F.2d at 51. Rather, in stark contrast to Erwin's active role in GCAD, the taxpayer in *O'Connor* merely provided the operational cash for the company and received periodic financial reports. *Id.* Our friend in dissent (who authored *O'Connor*) does not similarly contend that *O'Connor* assists Erwin.

surely can. Given the undisputed facts here, we can only conclude that the Government demonstrated Erwin's responsible person status as a matter of law.

We note that other courts have reached precisely the same conclusion in considering similar facts. *See, e.g.*, *Jefferson v. United States*, 546 F.3d 477, 481 (7th Cir. 2008) (holding board president responsible person as a matter of law because he secured loans and directed past payment of taxes for the corporation, reviewed financial reports, and had check-signing authority); *Thosteson v. United States*, 331 F.3d 1294, 1299-1300 (llth Cir. 2003) (holding corporate officer and stockholder a responsible person as a matter of law even though he had "limited check writing authority, up to only $750, without a countersignature"); *Taylor v. IRS*, 69 F.3d 411, 417 (10th Cir. 1995) (holding corporate director and officer a responsible person as a matter of law because he "possessed sufficient control over corporate finances, had authority to borrow funds and write checks and thereby had the 'effective power' to pay the taxes" (quoting *Barnett*, 988 F.2d at 1454)); *Greenberg v. United States*, 46 F.3d 239, 243-

Rather, the dissent heavily relies on *Vinick*, a First Circuit case that Erwin never cites. Given that Vinick's corporate involvement primarily occurred outside of the tax periods in question and decreased significantly during the relevant periods, when his partner unilaterally took control of the company's day-to-day financial management, the First Circuit held Vinick was not a responsible person. In contrast, the undisputed facts here demonstrate Erwin was actively involved in GCAD's financial affairs and general management decision making *throughout* the corporation's entire existence. Notably, unlike Vinick, Erwin directed or negotiated payments to corporate creditors to reduce debts he had personally guaranteed. That Erwin ultimately took complete control of the corporation's finances after the tax periods in question does exactly what *Vinick* acknowledged such evidence could do, i.e. "cast light on [his] status as a responsible person" during those tax periods, 205 F.3d at 11 n.8, because it demonstrates his authority, at all times, to dictate financial decision making. Erwin even admitted at deposition that had he learned of the tax deficiencies earlier, he would have taken remedial action at that time.

44 (3d Cir. 1994) (holding in-house controller a responsible person as a matter of law even though he took instructions from the controlling stockholder and "feared for his job were he to independently issue a check for the [tax] delinquency"); *Kinnie*, 994 F.2d at 284 (holding corporate vice president and fifty-percent shareholder a responsible person as a matter of law because he had check-signing authority, hired an accountant to review the books, and eventually took control of the business); *Mazo v. United States*, 591 F.2d 1151, 1156 (5th Cir. 1979) (holding corporate stockholders, officers, and directors responsible persons as a matter of law even though others handled all day-to-day operations and prepared all corporate checks).

Erwin's contention that others in the company may have been just as, or even more, responsible for GCAD's failure to remit payroll taxes during the tax periods in issue does not free him from § 6672 liability. For § 6672 imposes liability on "*all* responsible persons, not just . . . the *most* responsible person." *Turnbull*, 929 F.2d at 178. Erwin's own admissions conclusively demonstrate that he was *a* responsible person for § 6672 purposes during the relevant tax periods.

To summarize, Erwin admitted that at all times he owned at least one third of the stock of this closely-held corporation and served as its secretary, treasurer, vice president, and director. Erwin admitted that he signed loan documents and leases on behalf of the corporation, thus evidencing that he shared responsibility for establishing the corporation's financial policy. Erwin admitted that he approved restaurant site selection and regularly reviewed sales data. Erwin admitted holding quarterly meetings with his partners and weekly telephone calls with the general manager to discuss the restaurants. Erwin admitted that he directed or negotiated payments to certain favored creditors to reduce GCAD debt, which he had personally guaranteed. Erwin admitted that he hired and fired upper-management employees, including GCAD's accountants. Finally, although Erwin delegated many of the

day-to-day financial responsibilities of the corporation to others, he admitted that he infused capital into GCAD and admonished the Light brothers, over whom he had significant control, to stay current with the company's tax obligations.[7]

In short, the undisputed facts—indeed Erwin's own admissions—demonstrate, as a matter of law, that Erwin was a responsible person under § 6672 during the relevant tax periods.

IV.

Having found Erwin a "responsible person," we turn to whether he "willfully" failed to collect, account for, or remit payroll taxes to the United States. *Plett*, 185 F.3d at 219. This inquiry focuses on whether Erwin had "knowledge of nonpayment or reckless disregard of whether the payments were being made." *Id.* (quoting *Turpin v. United States*, 970 F.2d 1344, 1347 (4th Cir. 1992)). A responsible person's intentional preference for creditors other than the United States establishes willfulness as a matter of law; such an intentional preference occurs when the responsible person knows of or

---

[7]Despite making these and other admissions in deposition, Erwin maintains that we must accept as true his contradictory averments in a later-filed affidavit, in which he claims in conclusory fashion that during the tax periods at issue he had no role in managing GCAD or any control over its financial affairs. Reply Br. at 2. The dissent also appears to embrace this view, relying on Erwin's later "sworn statement" as creating an asserted factual dispute with Erwin's *prior* sworn deposition testimony. Such reliance is misplaced; "[i]t is well established that '[a] genuine issue of fact is not created where the only issue of fact is to determine which of the two conflicting versions of [a party's] testimony is correct.'" *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 198 (4th Cir. 1997) (quoting *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984)); *accord Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 341 (4th Cir. 2001); *S.P. v. City of Takoma Park, Md.*, 134 F.3d 260, 273 n.12 (4th Cir. 1998) (noting that a party's "later denial" of earlier "statements does not create a genuine issue of a material fact").

recklessly disregards an unpaid deficiency. *Id.*; *Turpin*, 970 F.2d at 1347.

By the end of 1998, Erwin knew that GCAD had financial difficulties. Indeed, in December 1998 Erwin made a special capital contribution to pay a tax delinquency from a prior quarter. At that time, Erwin also admonished the Light brothers to make timely payments in the future, but he did not monitor the situation personally to ensure future payment, nor did he advise the Light brothers to implement additional internal controls.

Although Erwin's lack of oversight in all likelihood contributed to the Light brothers' failure to remit payroll taxes for the fourth quarter of 1998 and the first three quarters of 1999, the record, viewed in the light most favorable to Erwin, does not support a finding—as a matter of law — that prior to August 1999 Erwin had *actual knowledge* that the Light brothers continually failed to pay GCAD's payroll taxes. Thus, whether Erwin acted willfully during this time, as a matter of law, depends on whether he acted with "reckless disregard" of GCAD's tax obligations. *See Turpin*, 970 F.2d at 1347.

Erwin claims that he thought that the Light brothers would obey his instruction to stay current with GCAD's tax obligations, that Coggin was monitoring the Light brothers, and that the Light brothers were professionals with experience accounting for Golden Corral restaurants in the past. Arguably, a fact finder fully crediting this testimony might conclude that Erwin's actions, although negligent, did not rise to the level of recklessness. *See id.* at 1347 n.4 ("Mere negligence in failing to ascertain facts regarding a tax delinquency . . . is insufficient to constitute willfulness under [§] 6672(a)." (internal quotation marks omitted)).

Even assuming, however, that Erwin did not act willfully *prior* to learning of the full extent of the tax deficiencies in

August 1999, his conduct *after* that point unquestionably evidences willfulness as a matter of law. During the third quarter of 1999, GCAD paid just a fraction of its payroll tax liability. Although Erwin and Coggin each made capital contributions to cover the deficiency in December 1999, GCAD still owed over $100,000 for that quarter alone and had not satisfied deficiencies from 1998 and the first two quarters of 1999. The record does not conclusively reveal the *extent* of Erwin's actual knowledge at this point in time, but certainly demonstrates that by that time he was on notice that GCAD owed substantial payroll taxes to the IRS. Yet Erwin and his partners continued to rely on the Light brothers to address the problem for several more months. Erwin's failure to assess and remedy the payroll tax deficiencies immediately upon learning of their existence in August 1999 constitutes unreasonable willful conduct. *Cf. id.* at 1350 (noting the relevance of responsible person's immediate action to address deficiencies upon learning of them). This is particularly so given that, at Erwin's direction, GCAD paid other creditors during this period. Thus, Erwin is liable for any outstanding third-quarter 1999 deficiencies. *See Plett*, 185 F.3d at 219.

Moreover, following the lead of every other circuit to consider the question, we adopt the rule that when a responsible person learns that withholding taxes have gone unpaid in past quarters for which he was responsible, he has a duty to use all current and future unencumbered funds available to the corporation to pay those back taxes. *See, e.g.*, *Thosteson*, 331 F.3d at 1300-01; *United States v. Kim*, 111 F.3d 1351, 1357 (7th Cir. 1997); *Honey v. United States*, 963 F.2d 1083, 1089 (8th Cir. 1992); *Mazo*, 591 F.2d at 1157. Pursuant to this rule, as of August 1999, Erwin had a duty to use all unencumbered funds to reduce GCAD's tax liability from the prior quarters.

The record demonstrates that GCAD generated several million dollars in gross receipts after August 1999 and paid rent and food vendors with those funds instead of paying the IRS. (Erwin does not contend that any creditor held a security

interest in these funds superior to the IRS's interest. *See Honey*, 963 F.2d at 1090.) Accordingly, we hold that, by preferring GCAD's other creditors to the IRS, Erwin willfully failed to remit GCAD's payroll taxes for the fourth quarter of 1998 and the first three quarters of 1999.[8]

V.

For the reasons set forth above, the judgment of the district court is

*AFFIRMED.*

HAMILTON, Senior Circuit Judge, dissenting:

Because I believe a reasonable fact-finder, viewing the evidence in the light most favorable to Erwin and drawing all reasonable inferences from such evidence in his favor, could find that he was not a responsible person under 26 U.S.C. § 6672, I would vacate the judgment in favor of the Government and remand for trial. Accordingly, I respectfully dissent.

---

[8]Erwin raises a putative "reasonable cause" defense, arguing that GCAD had to use gross receipts to pay rent and vendors in order to stay operational. Courts that have recognized this defense have limited it to situations in which circumstances outside a taxpayer's control have thwarted his reasonable efforts to protect trust funds, and have not applied it in situations where the taxpayer made a conscious decision to pay other creditors. *See, e.g.*, *Thosteson*, 331 F.3d at 1301 (citing *Logal v. United States*, 195 F.3d 229, 233 (5th Cir. 1999); *see also Greenberg*, 46 F.3d at 244 ("It is no defense that the corporation was in financial distress and that funds were spent to keep the corporation in business with an expectation that sufficient revenue would later become available to pay the United States."). Thus, even were we to conclude that a "reasonable cause" defense to § 6672 liability exists, such a defense would not protect Erwin under these facts.

## I.

We review the district court's grant of summary judgment *de novo*. *Blaustein & Reich, Inc. v. Buckles*, 365 F.3d 281, 286 (4th Cir. 2004). A motion for summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). In determining whether a genuine issue of material fact exists in this case, precluding the entry of summary judgment in favor of the Government, we must view the evidence in the light most favorable to Erwin and draw all reasonable inferences from such evidence in his favor. *Edell & Assocs., P.C. v. Law Offices of Peter G. Angelos*, 264 F.3d 424, 429, 435-36 (4th Cir. 2001). We may not make credibility determinations or weigh the evidence. *Id.* at 435. And although we should review the record as a whole, we must disregard any evidence favorable to the Government as the moving party that a jury would not be required to believe. *Id.* at 436. *See also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000). "That is, [we] should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that the evidence comes from disinterested witnesses." *Reeves*, 530 U.S. at 151 (internal quotation marks omitted).

## II.

Mindful that in determining § 6672 liability, "the 'crucial inquiry is whether the person had the "effective power" to pay the taxes—that is, whether he had the actual authority or ability, in view of his status within the corporation, to pay the taxes owed,'" *Plett v. United States*, 185 F.3d 216, 219 (4th Cir. 1999), I will focus on the application of the *Plett* factors to the record evidence as we must view such evidence at the summary judgment stage.

I agree with the majority opinion that the first *Plett* factor, which asks whether the party upon whom the Government seeks to impose responsible person liability under § 6672 served as an officer or director of the company, cuts in favor of the Government. During the four quarters at issue, Erwin served as vice-president, secretary, and treasurer of GCAD, and served on its board of directors.

However, contrary to the majority opinion, I conclude that the second *Plett* factor, which asks whether Erwin controlled the company's payroll, cuts in favor of Erwin. The evidence shows that Erwin did not control GCAD's payroll during the four tax quarters at issue. First, the record contains a sworn statement by Erwin that he had no control over GCAD's payroll. Second, there is no evidence that Erwin personally oversaw GCAD's payroll. Third, the undisputed evidence shows that for all four quarters at issue, a professional accounting and tax service was in charge of GCAD's payroll, including collecting withholdings and paying such withholdings to the Government.[1] And although Erwin did participate in the decision to hire such professional accounting and tax service, this circumstance is a far cry from controlling GCAD's payroll functions.

Moreover, the fact that Erwin and the other shareholders infused capital into GCAD with instructions that the Light Brothers catch up the back withholding taxes, merely establishes that Erwin and the other shareholders did not want to see their investment in GCAD go down the drain because the corporation was not current in paying its federal withholding taxes. Accordingly, such infusions and instructions, which Erwin admitted during his deposition, are not inconsistent with Erwin's later sworn statement that he had no control over GCAD's payroll. Similarly, Erwin's seizure of control over GCAD's payroll functions after the tax periods at issue and

---

[1]Indeed, even the majority recognizes that "Erwin and his two partners did not directly manage GCAD's payroll." *Ante* at 11.

after he learned of the payroll withholding delinquencies for those periods reasonably suggests that Erwin decided to become the responsible person under § 6672 from then forward in order to protect his substantial investment. Contrary to the majority opinion, such conduct does not *require* an inference that Erwin was a responsible person under § 6672 for the tax periods in question.

Moving on to the third *Plett* factor, such factor cuts in favor of Erwin. Specifically, a reasonable jury could find that Erwin had limited decision-making authority about which creditors to prefer. For the most part, any creditor preferences made by Erwin during the tax periods at issue were made with infusions of investor capital. The record also contains the sworn statement of Erwin that, prior to October 1999, he had limited, to no decision-making ability, about which creditors of GCAD to prefer.

When the evidence is viewed through the proper summary judgment lens, the fourth *Plett* factor also cuts in favor of Erwin. Specifically, the record shows that he did not participate in the day-to-day operations of GCAD. First, the record contains the sworn statement of Erwin that, prior to October 1999, he had no responsibility for the day-to-day management of GCAD.[2] Moreover, the evidence in the record supports the reasonable inference that, during the four quarters at issue, with the exception of all aspects of accounting and payroll, Pintner was solely responsible for the day-to-day operations of GCAD. Indeed, "Pintner came to GCAD upon the recommendation of various corporate officers of Golden Corral who presented him as a seasoned operator of the Golden Corral

---

[2]As the record evidence must be viewed at the summary judgment stage, Erwin gave no deposition testimony that is inconsistent with his later sworn statement that he had "no responsibility for the day-to-day management of" GCAD. (J.A. 1081). Accordingly, reliance on such statement in the mix of evidence carrying Erwin's burden in successfully opposing the Government's summary judgment motion is not misplaced as suggested by the majority. *Ante* at 17 n.7.

concept." (J.A. 1077). The evidence supports the reasonable inference that, during the four quarters at issue, the Light Brothers were solely responsible for all aspects of accounting and payroll, including financial reporting to Pintner and, by extension, the GCAD shareholders. While Erwin's activities on behalf of GCAD, for example, the negotiation of leases and the choosing of site locations for the restaurants, show that he was more than a passive investor, they do not establish that he participated in the day-to-day operations of GCAD. Moreover, the fact that Erwin reviewed GCAD's sales figures on a weekly basis can support the reasonable inference that he did so to monitor the status of his investment. It does not require the inference, as the majority suggests, that Erwin participated in GCAD's day-to-day management.[3]

The fifth *Plett* factor, which asks whether Erwin had check writing authority, also favors Erwin.[4] The evidence is undisputed that Erwin did not possess the power to sign checks during the four quarters at issue, nor was he a signatory on any of GCAD's bank accounts during such quarters. The focus of this factor is whether the individual at issue possesses check-writing authority, because the lack of such authority suggests that he is not a responsible person under § 6672.

Finally, the sixth *Plett* factor, which asks whether Erwin had the ability to hire and fire employees cuts both ways.[5] On

---

[3]I note that the majority opinion mentions that Pintner testified in deposition that he spoke to Erwin daily regarding sales figures and the performance of individual stores. *See ante* at 4 n.2. Because this testimony is inconsistent with Erwin's testimony that he only spoke with Pintner about such matters on a weekly basis, Pintner's version cannot be considered in assessing the propriety of the Government's summary judgment motion. *Edell & Assocs., P.C.*, 264 F.3d at 429.

[4]For purposes of clarity, I note that *Plett* itself lists check-writing authority as the fifth of six factors serving as indicia of the requisite authority to pay a company's payroll taxes, while the majority opinion in the present cases lists it as the sixth factor.

[5]The majority opinion lists this as the fifth *Plett* factor.

the one hand, the undisputed evidence shows that Erwin substantially participated in the hiring and firing decisions with respect to GCAD's top management, including hiring the Light Brothers. On the other hand, the evidence shows that Erwin did not participate at all in routine personnel decisions.

Examining the *Plett* factors *in toto*, in my considered opinion, Erwin has proffered sufficient evidence to stave off the Government's motion for summary judgment. More specifically, when the evidence in this case is viewed in the light most favorable to Erwin, and all reasonable inferences are drawn in his favor, a reasonable fact finder could find, under the totality of the circumstances, that Erwin was not a responsible person with respect to GCAD's withholding taxes for the last quarter of 1998 and the first three quarters of 1999—*i.e.*, Erwin did not have the effective power to pay those taxes during those quarters.

My view is substantially supported by the First Circuit's decision in *Vinick v. United States* (*Vinick II*), 205 F.3d 1, 9 (1st Cir. 2000), which is not cited by either party. In *Vinick II*, the Government assessed a nearly $50,000 penalty against Arnold Vinick (Vinick) pursuant to § 6672. *Id.* at 5. The assessment alleged failed withholding payments for the last three quarters of 1989 and the first two quarters of 1990 with respect to Jefferson Bronze, Inc. (Jefferson Bronze). *Id.*

Vinick paid a small portion of the penalty and filed a claim for a refund. *Id.* at 6. After the Government denied the claim, Vinick sued for a refund. *Id.* The Government counterclaimed for the balance due and moved for summary judgment. *Id.* at 6. The district court granted summary judgment for the Government, and Vinick appealed. *Id.* The First Circuit reversed and remanded for further proceedings. *Vinick v. Comm'r of IRS* (*Vinick I*), 110 F.3d 168 (1st Cir. 1997). Following a bench trial, the district court again ruled in favor of the Government by finding Vinick to be a responsible person. *Vinick II*, 205 F.3d at 6. The First Circuit reversed again, holding that

Vinick was not a responsible person under § 6672 as a matter of law. *Vinick II*, 205 F.3d at 15.

Vinick was a CPA in private practice and a former IRS employee. *Id.* at 4. In 1981, he and two other persons (Letterman and Mayer) formed Jefferson Bronze for the purpose of operating a foundry. *Id.* The three men, who each owned one-third of Jefferson Bronze's stock, personally guaranteed the Small Business Administration loan used to start-up the business and pledged their homes as collateral. *Id.* Letterman became president, Vinick became treasurer, and Mayer became the day-to-day manager of the foundry. *Id.* Soon after its formation, Jefferson Bronze began a long period of financial difficulties. *Id.*

The remaining relevant facts are as follows: (1) throughout the history of Vinick's involvement in the corporation, he never gave up his accounting practice and never had an office at Jefferson Bronze; (2) although Vinick had check-writing authority on Jefferson Bronze's checking accounts, he never signed checks prior to the company's filing for Chapter 11 bankruptcy; (3) Vinick prepared Jefferson Bronze's quarterly employment tax returns; (4) in 1983, Letterman fired Mayer, Letterman and Vinick acquired Mayer's share of the corporation, and each became a half owner of Jefferson Bronze; (5) Vinick hired Ronald Ouellette (Ouellette) as the new manager; (6) Ouellette ran the office and the foundry, and his wife worked part-time as the bookkeeper and signed the company checks and payroll returns; (7) Vinick occasionally would visit the Ouellette home to collect information needed to complete the quarterly returns, and after their preparation, Vinick would return the completed, unsigned forms to the Ouellette home; (8) usually once a month, Vinick would discuss with Ouellette the financial condition of the corporation and would stress to him the need to pay the taxes; (9) during Ouellette's tenure as manager, Jefferson Bronze's financial troubles continued, with Jefferson Bronze failing to timely pay the withholding taxes due; (10) regardless, Jefferson Bronze always

filed its tax returns on time; (11) at some point, Letterman and Vinick obtained a $35,000 loan for Jefferson Bronze, which they secured with personal guarantees; (12) in 1985, Vinick negotiated with an Internal Revenue Service revenue officer a payment plan for the taxes Jefferson Bronze owed, and relayed the terms of the plan to Ouellette, who complied with the plan's requirements; (13) after Jefferson Bronze completed payment of these taxes, it experienced no further tax delinquency until Letterman took over as manager; (14) in January 1988, Letterman decided on his own to take over as the day-to-day financial manager of the corporation (Ouelette continued as the foundry manager for non-financial matters); (15) Letterman's wife then took over as office manager and bookkeeper; (16) during this time, Vinick continued to collect the financial information, to prepare the quarterly tax returns, and to leave them for Letterman to sign; (17) while he also continued to advise Letterman to pay the corporation's taxes, Vinick became less involved in the financial affairs of the corporation as Letterman's role increased; (18) in May 1988, Letterman and Vinick successfully negotiated a refinancing of Jefferson Bronze's Small Business Administration loan with a private bank, including signing the note in their individual and corporate capacities; (19) additionally, Vinick pledged his home as collateral on the refinancing; (20) around March 1989, Jefferson Bronze became delinquent on such note, prompting Letterman and Vinick to discuss the financial future of Jefferson Bronze with the bank's vice president; (21) from April 1989 to June 1990, during Letterman's tenure as manager and prior to Vinick's ever having signed a company check, Jefferson Bronze again fell behind in its withholding tax obligations; (22) by July 1990, Jefferson Bronze had filed for Chapter 11 bankruptcy; and (23) a year later the bank foreclosed on the note, with Jefferson Bronze finally closing its doors shortly thereafter.

After applying virtually the same factors as we outlined in *Plett* to the facts just set forth, the First Circuit held that "Vinick as a matter of law was not a responsible person within the

meaning of 26 U.S.C. § 6672(a)." *Vinick*, 205 F.3d at 15. Significant to the First Circuit's holding, were the following facts: (1) at no time did Vinick exercise any decision-making authority over which creditors Jefferson Bronze paid; (2) during the quarters in question, Vinick had no involvement in the day-to-day operations of Jefferson Bronze; (3) during the quarters in question, although Vinick had check-signing authority, he signed no checks and lacked access to the checkbook; and (4) although Vinick participated in the decision to hire the general manager, he was not involved in the routine hiring and firing of employees. In sum, the First Circuit concluded that while Vinick "may have been more than a mere passive investor in the corporation," the evidence did not establish that he "possessed actual, exercised authority over the company's financial matters, including the duty and power to determine which creditors to pay," and therefore, "as a matter of law he cannot be a responsible person." *Id.* at 14-15.

While I do not suggest here that, under the facts of the present case, Erwin, as a matter of law, cannot be a responsible person under § 6672, I do believe that, based on the evidence in this case, a reasonable jury could find that that he is not a responsible person under § 6672. The facts in *Vinick* are substantially similar to the facts in the present case. Like Vinick, Erwin was a one-third shareholder in the corporation and personally guaranteed loans for the corporation. Like Vinick, Erwin held the title of the corporation's treasurer. Like Vinick, Erwin received financial information about the corporation from the general manager and stressed the need to keep payroll taxes current to the person responsible for actually paying such taxes. Like Vinick, Erwin participated in the hiring and firing decisions with respect to top management, but did not with respect to routine personnel decisions. Like Vinick, Erwin took actions to catch up back withholding taxes from time periods different from the ones in question (*i.e.*, Vinick negotiated a payment plan with the Internal Revenue Service, while Erwin contributed capital with an order to use

the money to catch up the back withholding taxes). Finally, like Vinick, Erwin did not participate in the day-to-day operations of the corporation.

In sum, I recognize that this is a close case. However, for the reasons just set forth, I believe the scale tips in favor of Erwin at the summary judgment stage.

## III.

In conclusion, I would hold the district court erred in holding that the responsible person inquiry cuts in favor of the Government on summary judgment. Accordingly, I would not reach the willfulness element and would vacate the judgment in favor of the Government and remand for trial.